CITIZENS UNITED FOR FREE SPEECH II and Carol A. Surgens and Harry L. Brown, Jr., Plaintiffs,

v.

LONG BEACH TOWNSHIP BOARD OF COMMISSIONERS and Sean Devitt, Defendants.

Civ. A. No. 91–2776 (MLP).

United States District Court, D. New Jersey.

Sept. 25, 1992.

L. Gilbert Farr, Somerville, N.J., for plaintiffs.

Philip G. Pagano, Magee and Pagano, Wall Tp., N.J., for defendants.

## OPINION

PARELL, District Judge.

This matter is before the court on plaintiffs' application for a preliminary injunc-

tion to restrain enforcement of Section 22–6.2(q) of Long Beach Township Ordinance 89–43C ("the Ordinance"). The Ordinance, by its terms, establishes standards for the fabrication, erection and use of signs, symbols, markings and advertising devices within Long Beach Township. Section 22–6.2(q) pertains to real estate signs, and by stipulation of the parties this injunctive application is limited to addressing that section of the Ordinance. The court has reviewed and considered the briefs and certifications filed by the parties, and the testimony and exhibits presented at the hearing on this application which was conducted on July 1, 1992. For the reasons stated below, the court will grant the injunction.

## PROCEDURAL BACKGROUND

This action was initiated by a complaint filed on June 21, 1991 seeking a declaratory judgment that the Ordinance is unconstitutional, and seeking injunctive relief from its actual or prospective enforcement. Plaintiffs are Citizens United for Free Speech II ("CUFFS II"), a voluntary unincorporated association of individuals asserting a personal interest in the matter; Carol A. Surgens, a part-time resident of the Township of Long Beach ("the Township"); and Harry L. Brown, Jr., a licensed realtor in the Township. Defendants are the Township Board of Commissioners and Sean A. Devitt, the Township Zoning Officer.

Plaintiffs sought a temporary restraining order *ex parte* on the date the complaint was filed. This court (Honorable John C. Lifland, U.S.D.J.) denied the application initially on that date. The court then conducted a telephone conference with counsel for both parties on June 26, 1991, and after reviewing the pleadings, briefs and certifications filed at that time, on August 27, 1991 the court issued an order denying the requested temporary restraint and directing that a preliminary injunction hearing be conducted within thirty days. The court's denial of preliminary relief, as stated in the order, was based upon the representations of defendants' counsel that there were not currently pending, and there would not in the future be, any enforcement proceedings against plaintiffs under the Ordinance while the application for preliminary injunction was pending before this court.

The injunctive matter was not immediately scheduled for hearing, apparently because the parties were awaiting a determination by the Superior Court of New Jersey as to whether the subject matter of this action might be barred by having been raised in an earlier-filed state court action which had been settled.[1] In May, 1992, counsel for plaintiffs contacted this court and renewed their request for a hearing on the application for preliminary injunction, explaining that the state court had recently ruled that the Ordinance in question here, Ordinance 89–43C enacted September 1, 1991, was not included in the prior settlement. The parties then conferred with the court; stipulated that the injunctive application would be narrowed to address only the portion of the Ordinance dealing with real estate signs ("Subsection Q"); submitted supplemental briefs; conducted expedited limited discovery; and presented oral testimony and written exhibits at the hearing on July 1, 1992. Written summations were subsequently submitted.

1. The Township apparently first adopted an ordinance to regulate signs in 1986; the plaintiffs challenged that ordinance in state court, and it appears that the state court, for some period at least, enjoined enforcement of the 1986 ordinance. The Township passed an amended ordinance in 1987, but the plaintiffs then amended their state court complaint to attack that ordinance as well. Discovery, additional hearings, and settlement discussions continued in the state court action. When the Township passed the present ordinance in September 1989, the parties apparently discussed it during their settlement negotiations in the state court action, but the plaintiffs specifically resisted having the 1989 ordinance included in that action. When enforcement of the 1989 ordinance became imminent in the spring of 1991, plaintiffs filed their challenge to its constitutionality in this court. The state court action concerning the 1986 and 1987 ordinances was subsequently settled in April 1992, but the 1989 ordinance, subject of the pending action in this court, was specifically excluded from the state court settlement. The exact procedural history of the state court action is somewhat unclear because the record therein was sealed at settlement and is thus unavailable to this court.

## STATEMENT OF FACTS

Ordinance 89–43C is a plenary regulation of all use of signs throughout the Township. The overall scheme of the Ordinance creates three categories of signs: (1) those for which a permit must be issued by the Zoning Officer, Ordinance § 22–3.1; (2) "exempt signs" that are described in detail and may be used without obtaining a permit, Ordinance § 22–6.2; and (3) "prohibited signs" that are not allowed under any circumstances, Ordinance § 22–7.

For purposes of the present application for a preliminary injunction, the parties have agreed to address only one limited portion of the Ordinance, Subsection Q of Section 22–6.2. Subsection Q regulates the use of real-estate signs advertising properties "for sale" or "for rent"; it specifies the precise circumstances under which such signs may be used as "exempt signs", *i.e.*, without the prior approval of the Zoning Officer. Subsection Q, in its entirety, reads as follows:

> (q) *Real estate signs.* One real estate sign advertising the property ... on which it is located, either "for sale" or "for rent" or one sign advertising the property "for sale or for rent" (single or double face) on any lot or parcel, provided such sign is located entirely within the property to which the sign applies, is not illuminated, does not exceed an area of six square feet with a maximum dimension of four feet, and is removed within fifteen (15) days after the sale has been co[n]sum[m]ated. For rent signs are expressly prohibited during the months of June, July, August and September, provided, HOWEVER, for rent signs may be displayed at any time, including the months of June, July, August and September, if they are located and placed in a window of the premises advertised for rent. One additional sign, as described above, is permitted where a parcel has in excess of three hundred feet of frontage or fronts on two streets.

The parties do not disagree over the meaning, application, or construction of the Ordinance or Subsection Q thereof; their points of difference center on whether the Ordinance as written, and Subsection Q in particular, meet the established legal standards governing permissible government regulation of speech or expression. To assist the court in making that determination, the parties presented testimony and exhibits at the hearing conducted on July 1, 1992. The court did not note any significant contradictions or differences in the facts as presented by the respective parties. Nonetheless, the following summary of the parties' presentations will serve as necessary background to the legal analysis of the constitutionality of Subsection Q.

## I. EVIDENCE PRESENTED AT THE HEARING

The witnesses who testified on behalf of plaintiffs were the two named individual plaintiffs, Carol A. Surgens and Harry L. Brown, Jr. Testimony on behalf of defendants was provided by James J. Mancini, the Mayor of defendant Long Beach Township; by defendant Sean A. Devitt, the Township Zoning Officer; and by Jean DiPaola, who is Executive Director of the Ocean County Chamber of Commerce.

### A. *Testimony of Plaintiff Carol A. Surgens*

Ms. Surgens testified that she resides in Somerville, New Jersey, and also, since at least 1981, she spends significant time in Long Beach Township at 2A West McKinley Avenue, Holgate, New Jersey, a property owned by Gilbert Farr ("the Farr property"). The Township is predominantly a summer beach resort, and the Farr property is often rented out. The principal rental periods for the Farr property are June to September, with additional weeks and weekends rented off-season. Since 1981, Ms. Surgens has been assisting in renting the Farr property in various ways, including answering telephone inquiries from people responding to the "for rent" signs displayed on the property, and showing the property to prospective renters. She also executes leases as the agent for Mr. Farr.

There were at the time of the hearing two "for rent" signs on the Farr property. The signs were affixed to the railing on the

perimeter of the house, located to give maximum exposure to the two adjoining streets and an adjacent parking lot. Ms. Surgens testified that in the years prior to the effective date of the Ordinance, the property was advertised for rent primarily by in-ground signs. She was not aware of any traffic or safety concerns, or of any detriment to the property's value, resulting from the in-ground signs.

Ms. Surgens explained several reasons why she and the owner would not want to display rental signs in the window of the Farr property: (1) the design of the windows would not easily accommodate signs; (2) the location of the windows on the property is 12 to 20 feet farther back than the rail, and less visible from the street; (3) the size of the sign which is currently on the railing would not fit in the windows; (4) the house has an ocean view which would be partially obstructed by a window sign; and (5) she would find the appearance of a window sign aesthetically displeasing.

Ms. Surgens compared the use of "for rent" signs on the Farr property and other modes of advertising the property for rent. She said that signs have been effective; *e.g.*, calls in response to the signs have enabled her to make a list of prospects and when they are interested in renting, and have allowed her to develop a steady tenant base, including repeaters. The use of signs, she stated, has helped to supplement the rentals received through real estate agents and in some periods it provided tenants when the realtors did not. Ms. Surgens testified that signs are more cost-effective than newspaper ads or realtor listings. She estimated that on-site signs have generated more inquiries during the summer months than in off-season months. She recalled that there was one year when there were no rentals except by means of signs. She asserted that in her experience with the Farr property, if there are no signs on the premises during the summer, it is highly unlikely that the property will be rented in that period.

At various times, Ms. Surgens has also been a tenant in Long Beach Township. She has primarily relied on signs on the

properties in locating and obtaining those rentals, and seeks to do so currently and in the future. She feels that the requirement that "for rent" signs be posted only in windows during the summer season has the effect of reducing the use of such signs, and thus prevents her from being adequately informed of the availability of rental properties.

Ms. Surgens also testified concerning the formation and membership of CUFFS II, the plaintiff organization. CUFFS II was formed in June 1991, after Mr. Farr had received a Notice of Violation from the Township because of the "for rent" signs posted on his property. At that time several community members joined with Mr. Farr to seek relief from the Ordinance's regulation of real estate signs; the group subsequently became concerned about other sections of the Ordinance as well. Ms. Surgens produced a list of 29 individuals and companies who are current members of CUFFS II.

She described some practical problems in requiring "for rent" signs to be in the windows of properties, in addition to those described earlier concerning the Farr property. Certain neighbors of the Farr property have a house with no windows visible from the street larger than approximately six inches by twelve inches. Also, one member of CUFFS II owns property in the Loveladies section of the Township, where many homes are not visible from any public street.

B. *Testimony of Plaintiff Harry L. Brown*

Mr. Brown testified that he is a licensed real estate broker and has been an owner of Realty World, a sales and rental agency in the Township, since approximately 1985. Mr. Brown stated that in his experience, rentals in the Township occur in a "rolling time frame." He said that some properties, particularly ocean front listings, are usually rented for the entire season by May 1; but generally, many people also call him seeking near-term rentals during the summer months. At the time of the hearing (July 1) he had a significant num-

ber of listed vacancies for July and August, and also had some rentals available for September and October. In the prior year his seasonal rentals were mostly filled by July.

Mr. Brown stated that he customarily advertises rentals by newspaper ads (in both on- and off-island publications), and by yard signs. Prior to the enactment of the Ordinance, his agency used on-site signs during the summer season to advertise available rentals. Mr. Brown compared the effectiveness of newspaper ads and on-premises signs, saying that in using both methods regularly, his experience has been that more inquiries result from on-site signs than from any other source. He also stated that in his experience his agency does not get much business from the published ads.

Mr. Brown testified that on June 1, 1992, in compliance with the Ordinance, he removed all in-ground "for rent" signs from his listings. He did not place any "for rent" signs in the windows or ask his clients for permission to do so, for several reasons based on his experience as a broker, including: (1) the realtor signs used in yards are not appropriate for windows, given their size and weight; (2) windows come in many different sizes and locations; (3) renters have objected to obstructions blocking views from windows; and (4) he believes that signs in windows would not be as effective because they are not as observable by the public. Mr. Brown believes that the seasonal restriction on "for rent" signs has harmed his business economically.

### C. Testimony of James J. Mancini

Mr. Mancini has been the Mayor of Long Beach Township since 1964. He explained that as mayor, he is aware of the state of the rental market in the Township. He testified that about 60 to 70 percent of the properties in the Township are used as rentals; approximately 90% of the rentals are listed by realtors. Mr. Mancini said that the busiest season for the leasing of summer rentals is from the beginning of the year to Memorial Day, with particularly heavy activity during the George Washington's Birthday weekend in February. He acknowledged that during the summer months, there are still some rentals available for the then-current season.

He testified that he was familiar with the origins of the Ordinance; the public had expressed indignation about the proliferation of real estate signs, and the general feeling in the community was that the overuse of the signs made the Township undesirable.[2] He stated that the town was most distressed with "for rent" signs being left on the properties year-round, even when the properties were fully rented, more as advertising for realtors than as notice of availability. Mr. Mancini also testified from his own observation that there were streets in the Township where such signs were indeed prolific. He said that in his experience, people tend to put window signs up only when the house is available to rent.

Mr. Mancini read the minutes of the public meeting on the proposed Ordinance held on August 18, 1989 (Exhibit D–19), which stated:

The Mayor announced that this was the time for the Public Hearing on the Ordinance and invited anyone who cared to speak on the same to do so:

Mayor Mancini commented that he had met with island realtors regarding this ordinance and the majority were in support of prohibiting ... in-ground "For Rent" signs from June 1st until October 1st. The Mayor pointed out that these signs could be posted in a window at any time of the year.

Mr. W. Hart expressed his opinion that each trade should be entitled to an adver-

---

**2.** The Court permitted and considered this testimony from the Mayor of the Township, essentially summarizing viewpoints which had been communicated to him in the process of keeping informed on community issues as they arose, prior to publication of the proposed Ordinance.

The Court admitted but gave no weight to letters by citizens which were introduced into evidence by the Township, because those letters are all dated after the Ordinance was passed and do not separately address the subject of rental signs.

tising sign at construction sites. Mr. Hart also noted that he was against prohibiting "For Rent" signs at any time.

Mrs. C. Pescatore asked if there was a fee for signs displayed in windows and the Mayor answered in the negative.

On motion of Commissioner Little, seconded by Commissioner Pescatore the Public Hearing was closed.

Mr. Mancini also referred in his testimony to the Statement of Purpose set forth in the Ordinance as adopted:

22–1.1. *Statement of purpose.* The purpose of this ordinance is to establish standards for the fabrication, erection and use of signs, symbols, markings and advertising devices within the Township. These standards are designed to protect and promote the public welfare, health and safety of persons within the community and to aid in the development and promotion of business and industry by providing sign regulations which encourage aesthetic creativity, effectiveness and flexibility in the design and use of such devices without creating detriment to the general public.

When asked about any traffic safety concerns with real estate signs, Mr. Mancini said he had no specific examples, although there have been complaints from police and residents regarding rubbernecking of drivers looking at signs. He added that prior to passage of the Ordinance, when yard signs were permitted, "there were twenty times more rental signs than we now see."

D. *Testimony of Jean DiPaola*

Ms. DiPaola is the Executive Director of the Ocean County Chamber of Commerce. She does not reside in Long Beach Township, but she meets and confers regularly with Township realtors in the course of her duties. She stated that, as part of her work, she helps to promote the tourist season in the Township and collects information from the local realtors on the progress of summer rentals. Beginning in winter and continuing until late May, her organization contacts a representative sampling of realtors, motels, and some boarding houses, to collect such information on rentals.

According to Ms. DiPaola's testimony, the rental season begins in January, increases around Washington's Birthday, and most rentals have been booked by the first of May. She said that there are still properties available throughout the summer, but the bulk will be rented in advance.

Ms. DiPaola testified that prior to the passage of the Ordinance in August 1989, she had attended two meetings of Township realtors at which the proliferation of real estate signs was discussed. The first of those meetings had been arranged by a local realtor, Mr. Inman, and was attended by approximately 60 agents, representing about 85% of the local agencies. The realtors' concerns included both aesthetic and business objections to the number of signs. Ms. DiPaola said that the thrust of the meeting was directed at eliminating sale and rental signs during the summer season. She added that following those meetings, many of the realtors began taking down their signs voluntarily, even before the Ordinance was passed.

E. *Testimony of Defendant Sean A. Devitt*

Mr. Devitt has been the Zoning Officer of the Township since August 1989. His duties include the enforcement of the Ordinance pertaining to signs. His recollection was that no Notices of Violation under Subsection Q were issued during 1989, the year in which the Ordinance had become effective on September 1.[3]

He said that his practice in 1992 has been to look around the town approximately once a week during the summer season to determine compliance with the rental sign provision of the Ordinance. If he finds a violation he may pursue several steps before issuing a Notice of Violation, including calling or visiting the owners to remind them of the requirements. He said that he has issued five notices during the 1992 season; some violations (he did not recall how many) had been corrected voluntarily

---

3. Mr. Devitt was not asked to testify regarding any such notices in the years 1990 and 1991.

before issuance of a notice. Mr. Devitt was not aware of any traffic accidents or safety problems related to in-ground real estate signs.

Referring to the list of CUFFS II members, Mr. Devitt identified those members who are property owners of record in the Township. Mr. Devitt stated that on or about June 15, 1992, he and counsel for the Township made photographs of those members' properties, taken from approximately the middle of the street in most cases. Mr. Devitt testified that all of the photographed properties appeared to be in compliance with the Ordinance's requirements concerning real estate signs except the Farr property, and that window signs, where present, were legible from the street.

## DISCUSSION

The plaintiffs assert that Subsection Q (and the Ordinance as a whole) violates the First Amendment because it is a content-based restriction on speech that is not necessary to achieve a compelling governmental interest. Further, plaintiffs argue that, even absent the content-based distinctions of the Ordinance, it would not meet the standards for permissible regulation of commercial speech set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[4]

The defendants counter that Subsection Q is a regulation of commercial speech only, that commercial speech is entitled to a somewhat limited level of First Amendment protection, and that Subsection Q comports with the standards set forth in *Central Hudson*. Specifically, the defendants assert that the Ordinance was designed to advance the Township's interests in preserving an aesthetic environment, en-

suring traffic safety, and maintaining property values. The defendants further question the plaintiffs' standing to assert the constitutional challenges, and in particular, CUFFS II's ability to demonstrate a common harm to its members.

From the outset, it should be noted that there has been no evidence indicating, nor have plaintiffs asserted, that the defendants have a particular design to eradicate the speech of lessors or favor the speech of sellers of property. Indeed, even the plaintiffs might generally agree—although they certainly do not agree in the context of the Ordinance—that the defendants' interest in maintaining an attractive town is a worthy goal. Nonetheless, despite the natural sympathy that the defendants' objectives might evoke, the First Amendment's broad and powerful protections for free speech often demand that other concerns, even if worthy of themselves, must be subjected to exacting analysis and, when necessary, must be subordinated to constitutional imperatives.

Below, an analysis of the Supreme Court's recent decision in *R.A.V. v. City of St. Paul*, —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), demonstrates that commercial speech cannot be subjected to content-based restrictions unless the restrictions are necessary to achieve a compelling governmental interest. Application of that standard to the regulation at issue reveals that defendants have not yet demonstrated either a compelling interest or the requisite necessity. Further, the Township's restrictions on "for rent" signs, even were they not infirm under the test adapted from *R.A.V. v. St. Paul*, would not meet the test of *Central Hudson;* i.e., the defendants have not shown that the restrictions directly advance, in a manner no more extensive than necessary, a substantial governmental interest.[5]

---

**4.** Plaintiffs have also maintained that an equal protection "rational basis" analysis can be applied to invalidate the Ordinance. Since the court finds that Subsection Q is likely to be held unconstitutional both because it is not content-neutral and because it does not meet the standards of *Central Hudson*, the discussion will not reach the issues presented by plaintiffs' equal protection arguments.

**5.** The *R.A.V. v. St. Paul* test is of course more stringent than the *Central Hudson* test in that it requires a "compelling" as opposed to "substantial" governmental interest. However, the other aspects of the two tests are not so clearly differentiated. *R.A.V. v. St. Paul* requires that the regulation be "necessary" to achieve the interest; *Central Hudson* requires that the regulation "directly advance" the interest, and also that the

## II. STANDING

 The defendants have questioned whether CUFFS II has standing to challenge the Ordinance. However, limiting the present discussion to concerns with Subsection Q, even if CUFFS II were not a proper party to challenge the regulation, plaintiff Harry L. Brown, Jr. certainly has standing to challenge the "for rent" sign restrictions. As a Township realtor who has taken down his "for rent" signs because of the Ordinance and who credibly asserts a loss of business due to the absence of the signs, he has alleged the distinct injury necessary to confer standing. Mr. Brown's loss of opportunity for rental business is a legally sufficient basis for his challenge to the regulation. *See* 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.4 (1984). To obtain injunctive or declaratory relief, it is sufficient that there be at least one plaintiff with standing. After it has been determined that one plaintiff has standing, questions concerning the standing of other plaintiffs need not be reached. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263–64, 97 S.Ct. 555, 562, 50 L.Ed.2d 450, 463–64 (1977).[6]

## III. THE LIMITATIONS OF CONTENT-BASED REGULATION OF SPEECH

In response to plaintiffs' arguments that Subsection Q is constitutionally infirm because it distinguishes between speech on the basis of content, the defendants argue that the restrictions are permissible because of the commercial nature of the speech in question. However, the defendants have not argued that the limitations normally placed upon content-based regulations do not apply to content-based restrictions of commercial speech.

Indeed, a review of the Supreme Court's treatment of content-based regulations establishes that the general rule must be taken as applying fully to commercial speech. In *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), the Court held that a complete ban on "for sale" signs, enacted to stem "white flight" and thus preserve the racial balance in the town, was an impermissible content-based restriction on speech. Moreover, it is obvious that in *Linmark* the Court considered the "for sale" signs at issue to be a category of commercial speech. *Id.* at 91–92, 97 S.Ct. at 1617–18, 52 L.Ed.2d at 160–61 (analyzing the "for sale" sign ordinance with reference to First Amendment protections accorded commercial speech in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 [1976]). Thus, *Linmark* itself establishes, even if it does not openly state, that the careful limitation of content-based regulations applies to

regulation's extent be limited to what is "necessary" to advance the interest. Those standards may prove quite similar in their applications to particular facts; *see, e.g.,* discussions of each standard *infra* at 1232 ff. (*R.A.V. v. St. Paul*) and at 1234 ff. (*Central Hudson*).

**6.** While the court is not at present called upon to determine the question, it may be noted that Mr. Brown, and CUFFS II as well, appear to be appropriate parties to advance plaintiffs' allegations that the Ordinance more broadly impairs free speech. Even if Mr. Brown or the members of CUFFS II are themselves directly affected only by the Ordinance's provisions concerning "for rent" signs, they might nonetheless have standing to challenge restrictions on expression that would chill the First Amendment rights of other speakers. That view of standing derives from the analysis of *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 504, 101 S.Ct. 2882, 2890–91, 69 L.Ed.2d 800, 812–13 (1980). In *Metromedia*, the Court held that the appellants had direct standing, as owners of billboards containing both commercial and noncommercial speech, to challenge regulation of both types of expression. The Court further noted, *id.* at 504 n. 11, 101 S.Ct. at 2890 n. 11, 69 L.Ed.2d at 812 n. 11, that while it may have held that the overbreadth doctrine does not apply to commercial speech, it had "never held that one with a 'commercial interest' in speech also cannot challenge the facial validity of a statute on the grounds of its substantial infringement of the First Amendment interests of others. Were it otherwise, newspapers, radio stations, movie theaters and producers—often those with the highest interest and the largest stake in a First Amendment controversy—would not be able to challenge government limitations on speech as substantially overbroad."

commercial, as well as noncommercial, speech.[7]

It is clear from the Supreme Court's recent decision in *R.A.V. v. St. Paul, supra,* that commercial speech must be protected by the usual strictures against content-based distinctions. *R.A.V. v. St. Paul* found that the city's anti-hate-crimes ordinance violated the First Amendment because, even though the sanctions were directed against "fighting words", which is a category of speech entitled to very limited First Amendment protections, the city could not make content-based distinctions by penalizing the use of some "fighting words" and not the use of others. *R.A.V. v. St. Paul* continues the practice of distinguishing levels of First Amendment protections—with speech on important social and political topics accorded the highest level of protection, and commercial speech accorded a slightly lower, but still powerful, level of protection. The lowest level of protection is that afforded to certain distinctly disfavored categories of expression, *i.e.,* obscenity, defamation, and "fighting words".

*R.A.V. v. St. Paul* teaches that although those categories are often thought of as "outside" the protections of the First Amendment, they are merely protected to some lesser degree than other, more favored forms of speech. The central holding of the case is that even the proscribable forms of expression are certainly protected against wholesale content-based restrictions. *Id.,* —— U.S. at ——, 112 S.Ct. at 2543, 120 L.Ed.2d at 316. If proscribable speech is protected against content-based regulation, then commercial speech, which receives a higher degree of First Amendment protection than proscribable speech, is also protected against content-based regulation.

In the present case, Subsection Q of the Ordinance, differentiating among real-estate signs by whether they state "for sale" or "for rent", is certainly content-based. One might think that this is a trivial type of content distinction, not related to any serious or profound form of expression. However, the jurisprudence of content-based regulation itself draws no distinc-

**7.** At first glance it may seem that *Metromedia* can be read as generally permitting content-based regulation of commercial speech. The plurality opinion stated: "Although the city *may distinguish between the relative value of different categories of commercial speech,* the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests." *Id.* at 514, 101 S.Ct. at 2896, 69 L.Ed.2d at 819 (emphasis added). However, it does not appear that the foregoing statement was in any way intended to exempt the regulation of commercial speech from the usual requirement of content neutrality. For one thing, *Metromedia* dealt with a regulation of commercial billboards based on an on-site/off-site distinction—on-site billboards advertising a business were permitted, but the same business could not put the same ad on a billboard located elsewhere. Thus, when *Metromedia* speaks of the "relative values of different categories of commercial speech," the reference is to categories defined by their on-site/off-site locations, not to content-based categories. In addition, *Metromedia* facially invalidated the entire billboard ordinance because of its impermissible regulation of noncommercial speech. Under those circumstances, the plurality's discussions of commercial speech have the character of *dicta,* and were not intended as binding pronouncements on the nature of content-based restrictions.

Similarly, certain observations in *Central Hudson* may appear to call into question the application of content neutrality to commercial speech, but such statements, upon further analysis, cannot be so construed. In that case, 447 U.S. at 564 n. 6, 100 S.Ct. at 2350 n. 6, 65 L.Ed.2d at 349 n. 6, the Court, referring to commercial speech, stated that "[i]n most other contexts, the First Amendment prohibits regulation based on the content of the message.... Two features of commercial speech permit regulation of its content. First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity.... In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation'." (Citations omitted.)

When the foregoing passage speaks of regulation of content, it is clear, from the reference to the accuracy and lawfulness of speech, that what is meant is the longstanding rule that commercial speech which is misleading or proposes an illegal transaction is simply not protected by the First Amendment. *See Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. *Central Hudson* certainly does not indicate that government may differentiate among *protected* forms of commercial speech on the basis of content.

tions on the basis of the seriousness of the content—such would be inconsistent with the general ban against the content-based restrictions. The only exception that can permit some content-based restrictions is the "secondary effects" test, which has often been employed to justify regulation of speech and expression on sexual topics. *See, e.g., Barnes v. Glen Theatre, Inc.,* — U.S. —, —, 111 S.Ct. 2456, 2468–69, 115 L.Ed.2d 504, 524 (1991) (Souter, J., concurring) (state's interest in preventing secondary effects of prostitution, sexual assaults, and other criminal activity is sufficient to justify statute prohibiting nude dancing); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (ordinance regulating the location of adult theaters held content neutral, because it was aimed at secondary effects and not at the content of the films); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 54–55, 96 S.Ct. 2440, 2444–45, 49 L.Ed.2d 310, 317 (1976) (urban planners' and real estate experts' opinions gave cogent basis for regulation, *i.e.,* that adult movie theaters can cause increase in transients and crime, and can cause residents and businesses to move elsewhere).

 In the present case, while defendants have come close to alleging a "secondary effects" rationale, they have not presented sufficient evidence of such secondary effects, at least at the injunctive hearing stage of the case. Defendants claim that a proliferation of real-estate signs has impaired the aesthetic appearance of residential areas of Long Beach Township.[8] However, they have presented no concrete evidence to justify distinguishing between "for rent" and "for sale" signs in this regard. Any indications that "for rent" signs cause more of a problem than "for sale" signs seem anecdotal, at best.[9] The secondary-effects exception to normal content-neutral standards is not lightly granted—the required evidence usually consists of careful expert studies establishing the claimed effects; mere anecdotes and impressions of residents or town officials presumably would not be sufficient. *See, e.g., City of Renton v. Playtime Theatres,* 475 U.S. at 50–51, 106 S.Ct. at 930–31, 89 L.Ed.2d at 40 (city did not undertake its own studies but did rely on study done by neighboring city and on expert opinions); *Young v. American Mini Theatres,* 427 U.S. at 54–55, 96 S.Ct. at 2445, 49 L.Ed.2d at 317 (city council considered expert opinions concerning deleterious effects of adult entertainment business).

 If the "for rent" sign restrictions are content-based and are not subject to a secondary-effects exception, is the town altogether prohibited from such regulation? No, but the regulation must meet well-defined qualifications; the "for rent" sign restrictions here do not appear to meet them. Unless the commercial speech in question is fraudulent or promotes an illegal transaction,[10] such speech is protected from content-based regulation by at least as high a standard as that applied to the proscribable speech of "fighting words" in *R.A.V. v. St. Paul.* Thus, any content-based distinction applied to commercial speech must not only serve a *compelling* interest of the government, but must also be *necessary* to serve that interest. *Id.* — U.S. at —, 112 S.Ct. at 2549–50, 120 L.Ed.2d at 325–26.

 The defendants have established only one interest—aesthetics—underlying the enactment of the Ordinance. The evidence presented lacked any specificity about the number of signs displayed prior

---

8. As explained further *infra* at 1235, testimony on behalf of the defendants did not sufficiently establish two other claimed motives, traffic safety and maintaining property values.

9. Evidence presented by the defendants thus far has not significantly addressed any aesthetic distinction between "for sale" and "for rent" signs. Indeed, some of the proffered evidence indicates "for sale" signs may have occasioned equal or greater concern among residents.

10. In the commercial speech context, government may regulate false statements or inducements to illegal transactions, without running afoul of content-neutral requirements, because such speech is not entitled to First Amendment protection. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. However, neither of those special instances applies here.

to the Ordinance's enactment, the proportion of residents who may find the signs aesthetically offensive, or the effects of signs on potential renters or purchasers of real estate. In short, the defendants have not established an aesthetic interest so great that it could be considered in any sense "compelling".[11] Nor, even if one were to accept the interest as compelling, have the defendants established that the June through September "for rent" sign restrictions are necessary to achieve the desired aesthetic ends. As the plaintiffs point out, it is difficult to understand how aesthetic concerns differ by seasons of the year and how they differ between "for rent" and "for sale" signs. To establish a level of necessity justifying such content-based distinctions, the Township, at a minimum, would have to demonstrate what less restrictive regulations it had considered, and why those less restrictive measures would not solve the problem. *See, e.g., Central Hudson,* 447 U.S. at 570–71, 100 S.Ct. at 2353–54, 65 L.Ed.2d at 353–54 (placing burden on government agency to demonstrate that a more limited restriction would not adequately serve government's interest).

The Township's restriction of "for rent" signs therefore appears to be unconstitutional under *R.A.V. v. St. Paul* because it is not content neutral and the Township has not demonstrated that the restriction is necessary to serve a compelling interest. While it is early to assess the overall implications of *R.A.V. v. St. Paul* for commercial speech cases, the task at hand demands that the holding of that case be harmonized with the traditional commercial-speech analysis of *Central Hudson.* Presumably, if a regulation of commercial speech is content neutral, it continues to be measured by the *Central Hudson* standards. Even absent the problems arising from the Long Beach Ordinance's content-based distinctions, its regulation of "for rent" signs

would not meet the *Central Hudson* requirement of directly advancing a substantial governmental interest, without being more extensive than necessary.

## IV. THE REGULATION OF COMMERCIAL SPEECH UNDER *CENTRAL HUDSON*

■ Both parties have invoked *Central Hudson* as setting forth the definitive standards governing the regulation of commercial speech. In *Central Hudson,* the Supreme Court found that the New York Public Utility Commission could not prohibit promotional advertising by electric utilities in order to further its goals of energy conservation. *Central Hudson* set forth a test for the validity of such regulation of commercial speech based on four elements:

> In commercial speech cases ... a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. The *Central Hudson* test is obviously less stringent than the "necessary to meet a compelling interest" test of *R.A.V. v. St. Paul.*[12] Although the analysis pertaining to content-based regulations is sufficient in this instance to indicate that Subsection Q of the Ordinance would be invalidated upon full trial of this matter, the Court also finds that Subsection Q is likely to be held unconstitutional when

---

**11.** Since there is only limited and subjective evidence of the defendants' aesthetic interest and it is not compelling on the facts here presented, the court does not address the larger problem of when, if ever, aesthetics can provide a sufficiently "compelling" interest to justify

content-based distinctions. Courts have sometimes expressed doubt as to the sufficiency of an aesthetic interest standing alone; see discussion *infra* at 1235–1236.

**12.** See discussion *supra* at 1230 n. 5.

measured by the less stringent test of *Central Hudson.*

It is clear that the form of expression in which the plaintiffs wish to engage—posting "for rent" signs in their yards—concerns lawful activity and is not misleading. As plaintiffs have pointed out in their post-hearing submissions, Mayor Mancini conceded the lawfulness of the property rentals the plaintiffs wish to advertise. The inquiry then reaches the question of whether the asserted government interest in regulating this expression is substantial. The defendants assert that the Township's motives in passing the Ordinance were three: (1) promoting aesthetics, (2) ensuring traffic safety, and (3) preserving property values. However, in the evidence presented during the injunctive hearing, the defendants have only established the first of the foregoing motives as an interest supporting the enactment of the Ordinance. Mayor Mancini testified that traffic safety was really not an important consideration and that he was not aware of any verifiable incidents of traffic problems arising from the use of "for rent" signs. The defendants also presented no evidence concerning the increase or decrease of property values in the Township generally, let alone any link between property values and "for rent" signs.

Thus, the question of the substantiality of the interest to be promoted by the Ordinance comes down to: is aesthetics, the only demonstrated interest behind the passage of the Ordinance, sufficiently substantial to justify the restrictions set forth in Subsection Q? Even assuming that aesthetics might be an interest substantial enough, standing alone, to justify the regulation of commercial speech, the court finds that on the present facts, the defendants have not demonstrated a substantial interest in aesthetics that would justify the Ordinance's differential and strict regulation of "for rent" signs.

To begin with, aesthetic interests, while a valid area of concern for local govern-ment, are more difficult to define and to demonstrate than certain other governmental interests. It is relatively easy to demonstrate an interest in safety by recording numbers and causes of accidents; but, because aesthetic concerns are subjective, it is extremely difficult to quantify how much the attractiveness of a town might be impaired by certain types of advertising. It is true that the Supreme Court in *Metromedia*, 453 U.S. at 508, 101 S.Ct. at 2892, 69 L.Ed.2d at 815, accepted that "traffic safety and the appearance of the city" were substantial governmental goals. As to aesthetic motives, however, the Court noted that "[s]uch aesthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." *Id.* at 510, 101 S.Ct. at 2894, 69 L.Ed.2d at 816–17; *see also Loftus v. Township of Lawrence Park*, 764 F.Supp. 354, 361 (W.D.Pa.1991) ("we doubt that aesthetics or residential quietude is sufficiently compelling to ever justify a content-based restriction ... on freedom of expression"). *Metromedia* implies that when aesthetics is the only demonstrated interest underlying legislation, for purposes of First Amendment analysis, a court should demand quite a strong showing of such an interest to support the regulation of expression.

No strong showing has yet been made in this case, based on the evidence presented at the hearing. Mayor Mancini and Ms. DiPaola both testified that aesthetics were of concern to residents and particularly to realtors; but there are also indications, especially as to realtors, that many persons do not find these aesthetic concerns sufficient to require regulation of "for rent" signs.[13] On the whole, the defendants have demonstrated merely tenuous, subjective, and sporadic concerns with aesthetic interests, which, on the present record, are not sufficient to establish the "substantial"

---

**13.** *E.g.,* Ms. DiPaola testified that, at one of the meeting of realtors which she attended in May, 1991, of some thirty-five agencies represented, approximately 25 representatives signed a reso-lution urging elimination of signs. Thus, a significant number of the realtors at that meeting were apparently unmoved by the asserted aesthetic problem of signs.

governmental interests that *Central Hudson* demands as justification for the valid regulation of commercial speech.

Since *Central Hudson* sets up "substantial interests" as a preliminary requirement that must be fulfilled before reaching the third and fourth elements of properly constitutional regulation,[14] the court, strictly speaking, need not reach the However, from the evidence presented, it appears that Subsection Q is very likely infirm in failing to directly advance the asserted interest, and in being more extensive than necessary.[15] Even leaving aside the defendants' failure to demonstrate a "substantial" aesthetic interest underlying the Ordinance, it is probable that Subsection Q would not fulfill the third and fourth elements of the *Central Hudson* test.

Those elements, (1) whether the regulation directly advances the governmental interest and (2) whether it is more extensive than necessary, are interrelated and are both somewhat related to the preceding element, *i.e.*, the substantial nature of the governmental interest. In the present case, the indefiniteness and subjectivity of the asserted "aesthetic interest" also affects the third and fourth elements of analysis. When the governmental interest is tenuous, it is naturally difficult to ascertain if it is "directly advanced" by the regulation in question. Here, the seasonal nature of the "for rent" sign regulation creates an obvious question of how it can directly advance aesthetics. The plaintiffs have argued, persuasively, that it is unclear why strictly regulating "for rent" signs only during June, July, August and September, would generally contribute to the aesthetic appearance of the Township. Perhaps fewer people are present in the beach resort community during other months; but why would the town permit the supposed aesth-

etic detriments of "for rent" signs to assail its permanent residents all winter? And why are the supposedly unaesthetic signs permitted without limits during the January through May pre-season rental period, when making a positive impression upon potential vacationers would be, presumably, vital to the Township's economy? On the facts established thus far, there is no cogent explanation of how permitting the supposedly unaesthetic yard signs for two-thirds of the year, and prohibiting them for one-third, creates an overall advancement of aesthetic goals.

Like the seasonal limits of Subsection Q, its overall distinction between "for rent" and "for sale" signs also raises questions about how it directly advances aesthetic interests. Mayor Mancini testified that "for rent" signs were perceived as the greater problem because of an impression that realtors would display them constantly as advertising, regardless of a property's availability. But no proof was presented that realtors actually use signs in that fashion. Nor, as mentioned earlier, was there any concrete evidence that "for rent" signs were generally more prolific than "for sale" signs.

Finally, the Township did not meets its burden under *Central Hudson* of demonstrating that a more limited restriction would suffice to serve its interests. That burden must be construed reasonably; it would not entail, certainly, a showing that every conceivable alternative had been tried and had failed. However, the Township is obligated to show that it has at least considered obvious and sensible steps of less extensive reach, and has rejected them for cogent reasons. For example, in the present case, there has been no indication that the town has considered further con-

**14.** "If both inquiries [*i.e.*, (1) that the commercial speech in question concerns lawful activities and is not misleading; and (2) that the governmental interest is substantial] yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351.

**15.** Once again, it should be emphasized that the court's view of infirmities in Subsection Q does not imply that the valid regulation of "for rent" signs is impossible. The results here are based strictly on the evidence presented. On different facts, it is certainly conceivable that a city could regulate real-estate signs to whatever degree justified by a concrete showing of impairment of substantial governmental interests.

tent-neutral restrictions as to size, appearance, setback, etc., as a plausible substitute for a four-month total ban on in-ground "for rent" signs. *Central Hudson* at least demands some explanation of why a restriction must be as extensive as it is, and the Township has not given such an explanation for Subsection Q.

Altogether, then, Subsection Q does not appear to meet the tests for a valid regulation of commercial speech set forth in *Central Hudson*. The "for rent" signs that it undertakes to regulate are certainly truthful speech concerning a lawful transaction. The defendants have not demonstrated that the Township's aesthetic interests are of the substantial nature demanded to justify limitations on commercial expression. Particularly in view of the seasonal variations of the regulation and the differential treatment of "for sale" and "for rent" signs, the defendants have not established that the present regulation "directly advances" the aesthetic interests; nor have they established that it is not more extensive than necessary.

## V. STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

■ To justify the grant of a preliminary injunction, the court must find that the plaintiffs have demonstrated both a likelihood of success on the merits and a probability of irreparable harm absent injunctive relief. The court must also consider the balance of possible harm to other interested persons from the grant or denial of the injunction, and the public interest. *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197–98 (3d Cir.1990). In the present case, the foregoing extensive discussion of Subsection Q's infirmities under both a *R.A.V. v. St. Paul* test and a *Central Hudson* test clearly establishes plaintiffs' likelihood of success on the merits.

As to the required showing of irreparable harm, plaintiffs assert that a First Amendment violation necessarily entails irreparable harm to those who have been denied their rights of free speech, relying on *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct.

2673, 49 L.Ed.2d 547 (1976). In that case, the Supreme Court held that government employees who had been dismissed or threatened with dismissal because of their political party affiliations, had shown the irreparable injury necessary to a grant of a preliminary injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373, 96 S.Ct. at 2690, 49 L.Ed.2d at 565. The defendants, to the contrary, assert that *Hohe v. Casey*, 868 F.2d 69 (3d Cir.), *cert. denied*, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989), establishes that First Amendment violations need not constitute irreparable injury.

The defendants are somewhat overreading *Hohe v. Casey* and are taking its message out of context. In that case, the plaintiffs, non-union public employees, brought a First Amendment challenge to the collection of agency fee deductions by the union that was their bargaining agent. Essentially, the plaintiffs asserted that the withholding of the fees prevented them from using the funds to promote some unspecified alternative form of social or political expression. The plaintiffs had sought to enjoin the deductions, even though the union had agreed to hold all collected fees in escrow pending final determination. The district court denied preliminary injunctive relief, and the Court of Appeals for the Third Circuit affirmed on the basis that the collection of fees simply did not rise to a level of constitutional deprivation sufficient to show irreparable injury. The plaintiffs, if successful, would be able to obtain restitution of the fees from the escrowed funds. *Id.* at 73.

The present case is distinguishable on its facts from *Hohe v. Casey*. Even in *Hohe v. Casey*, the Court of Appeals did not question that a demonstrated suppression of free speech constitutes irreparable harm. *Id.* at 73. The plaintiffs challenging the Long Beach Township Ordinance have certainly demonstrated a curtailment of their rights of expression. The owner of the Farr property was issued a Notice of Violation, whose enforcement was apparently only abated by the filing of this action. The defendants themselves presented

evidence showing window "for rent" signs on premises of persons who are members of CUFFS II. From these individuals' membership in a group that challenges Subsection Q and the Ordinance in general, it is a very fair inference that those potential lessors would be displaying yard signs, were it not for the Ordinance. Individual plaintiff Harry L. Brown, Jr. testified that he took down his agency's yard signs because of the Ordinance.[16] Altogether, plaintiffs have demonstrated the sort of loss of First Amendment freedoms that constitutes irreparable harm under *Elrod v. Burns, supra.*

 Consideration of the final two elements for testing the propriety of a preliminary injunction, the balance of harms and the public interest, also supports the grant of an injunction here. While the defendants have a legitimate interest in promoting an aesthetic appearance for the Township, it is unclear, as explained earlier, how the "for rent" sign restrictions advance that aesthetic interest. If the Township wishes to craft a constitutionally adequate regulation of signs for aesthetic ends, it will have the coming winter season, during which "for rent" signs would be generally permitted even under Subsection Q, to accomplish that objective. Under the circumstances, it appears that little harm, if any, could accrue to the defendants from the grant of an injunction. In addition, in cases involving First Amendment speech

rights, consideration of the public interest tends to weigh in favor of enjoining undue restrictions on expression. For example, in *Loftus v. Township of Lawrence Park, supra,* a case challenging a prohibition of political yard signs, the court found the problem of censured expression to be a significant harm to the public.

## CONCLUSION

Subsection Q of Long Beach Township Ordinance 89–43C is a content-based regulation of commercial speech, in that it applies very different levels of restriction to "for sale" and "for rent" signs. Because it is not content neutral, in order to be permissible under the First Amendment, Subsection Q would have to be necessary to achieve a compelling governmental interest. The Township has thus far demonstrated only an aesthetic interest as motivation for the Ordinance; it has not yet demonstrated either that this interest is compelling, or that the differential treatment of "for rent" signs is necessary to achieve it. In addition, even if Subsection Q were content neutral, it would be an impermissible regulation of commercial speech because the defendants have not demonstrated that their aesthetic interest is substantial, that it is directly advanced by the "for rent" sign restriction, or that the restriction is not more extensive than necessary.

---

**16.** Even if Mr. Brown's harms may be largely economic, *i.e.,* loss of potential leasing fees, they are incapable of any accurate ascertainment and are thus appropriate objects of an injunctive remedy. 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2944 (1973). In addition, as noted earlier (see *supra* at 1231 n. 6), the plaintiffs apparently have standing, under the doctrine of overbreadth, to challenge the facial validity of the Ordinance generally. Thus, upon full trial of this case and consideration of permanent injunctive relief, it will probably be appropriate for the court to consider the non-economic harms that the Ordinance may cause to other, noncommercial speakers. The court does not at present reach beyond the issue of regulation of commercial speech in Subsection Q. Nonetheless, it may be noted in the context of likelihood of success on the merits and irreparable harm, that even an ordinance that was constitutional in its treatment of commercial speech would have to be

struck down as facially invalid if it impermissibly affected noncommercial speech. Such was the result in *Metromedia v. San Diego, supra.* Further, the Ordinance's overall structure, delineating "exempt signs", "prohibited signs", and signs requiring a permit, appears to invest the Township Zoning Officer with a degree of discretion over citizens' rights of expression that may not withstand void-for-vagueness analysis. *See, e.g., Forsyth County, Georgia v. The Nationalist Movement,* —— U.S. ——, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (ordinance imposing permit fees for demonstrations held facially invalid because of unbridled discretion of county administrator in setting fee); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (ordinance restricting door-to-door canvassing and solicitation held unconstitutionally vague because, *inter alia,* it did not provide explicit standards to guide officials in its application).

The defendants will therefore be enjoined from enforcement of Subsection Q pending resolution of this action or further order of the court.

An Order accompanies this opinion.

## ORDER

This matter having come before the Court on plaintiffs' application for a preliminary injunction restraining enforcement of Section 22–6.2(q) of Long Beach Township Ordinance 89–43C, and the Court having reviewed the submissions of the parties and the parties having presented testimony at the hearing held herein on July 1, 1992, and for good cause shown, as more particularly set forth in the accompanying opinion;

IT IS on this 25th day of September, 1992, ORDERED that plaintiffs' motion for a preliminary injunction is hereby GRANTED, and defendants Long Beach Township Board of Commissioners and Sean Devitt, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, are hereby RESTRAINED, ENJOINED and PROHIBITED from enforcing or attempting to enforce Section 22–6.2(q) of Long Beach Township Ordinance 89–43C, from and after the date that the bond requirement specified herein is met, until resolution of this action or further order of the court; and

IT IS FURTHER ORDERED that plaintiffs shall, within thirty (30) days of the date hereof, give security in the sum of $1,000.00 pursuant to Fed.R.Civ.P. 65(c); and

IT IS FURTHER ORDERED that this action is hereby referred to Magistrate–Judge John J. Hughes for scheduling of pretrial proceedings.