O’SCANNLAIN, Circuit Judge:
We must determine whether regulations which criminalize the broadcast of advertisements for casino gambling are consistent with the First Amendment.
I
Commercial lotteries and the advertising thereof have long been the subjects of state and federal regulation. Indeed, as early as 1827, Congress provided that “no postmaster, or assistant postmaster, shall act as agent for lottery offices.” Act of Mar. 2, 1827, § 6, 4 Stat. 238. By 1868, Congress had made it unlawful “to deposit in a post-office, to be sent by mail, any letters or circulars concerning lotteries, so-called gift concerts, or other similar enterprises offering prizes of any kind or any pretext whatsoever.” Act of July 27, 1868, § 13, 15 Stat. 196. In 1890, Congress extended its mailing ban from letters and circulars to newspapers. Anti-Lottery Act of 1890, § 1, 26 Stat. 465; see also Ex Parte Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93 (1892) (upholding 1890 Act against First Amendment challenge). And in 1895, Congress eliminated interstate lotteries altogether by prohibiting the transportation of lottery tickets in interstate commerce. Act of Mar. 2, 1895, § 1, 28 Stat. 963; see also Champion v. Ames (Lottery Case), 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903) (upholding constitutionality of 1895 Act against challenge that it exceeded Congress’ power under commerce clause).
Consistent with this regulatory tradition, Congress in 1934 enacted legislation criminalizing the broadcast advertisement of com *-254 mercial lotteries. Communications Act of 1934, 48 Stat. 1064, 1088. This legislation is the predecessor of the statute at issue here, 18 U.S.C. § 1304. In the years- following the enactment of section 1304, Congress has amended the federal anti-lottery statutes on several occasions; however, Congress has chosen not to lift the ban on the broadcast advertisement of private casino gambling.
It is precisely this restriction which troubles our litigants. Valley Broadcasting Company and Sierra Broadcasting Company (“the Broadcasters”) are Nevada corporations which own and operate television stations in Las Vegas and Reno, Nevada, respectively. The bulk of the Broadcasters’ audience is located in Nevada; however, 4% (13,200/302,200) of all households receiving Valley Broadcasting signals reside in Utah, and 19% (37,200/197,200) of all households receiving Sierra Broadcasting signals reside in California. The Broadcasters desire to broadcast advertisements for casino gambling, an activity that is legal in the State of Nevada. The Broadcasters have declined to accept such advertising for fear of prosecution under 18 U.S.C. § 1304 and its implementing regulation, 47 C.F.R. § 73.1211.[1]
On May 14, 1992, the Broadcasters brought suit against the United States and the Federal Communications Commission (collectively “the government”), seeking declaratory and injunctive relief. Among other claims, the Broadcasters contended that 18 U.S.C. § 1304 and 47 C.F.R. § 73.12Í1 violate the First Amendment of the United States Constitution.[2] The government disagreed.
The district court agreed with the Broadcasters and struck down the regulations as unconstitutional. The government appeals.
II
We begin our endeavor by remarking upon the unique protections afforded that speech which is commonly designated “commercial.” It is without doubt that “[t]he First Amendment ... protects commercial speech from unwarranted governmental regulation.” Central Hudson Gas & Elec. Corp. v. Public Serv. Comm’n, 447 U.S. 557, 561-62, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980) (rejecting “the ‘highly paternalistic’ view that government has complete power to suppress or regulate commercial speech”). That said, we note that such protection is less than that afforded other constitutionally protected expression. See id. at 563, 100 S.Ct. at 2350. Accordingly, restrictions that might be inconsistent with the First Amendment’s protection of other varieties of speech are tolerated in the area of commercial speech.
In Central Hudson, the Supreme Court articulated a four-part test under which to analyze the constitutionality of government regulations limiting commercial speech:
At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be mislead *-253 ing. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.
Id. at 566,100 S.Ct. at 2351.[3]
The parties agree that the advertising at issue is neither illegal nor misleading. Rather, their dispute centers around the remaining three prongs of Central Hudson. We treat each prong in turn.
A
The government asserts two interests. First, the government contends, it has an interest in reducing public participation in commercial lotteries. Second, the government claims, it has a substantial interest in protecting those states that choose not to permit casino gambling within their borders.
With regard to its first interest, the government explains that “[sjeetion 1304 serves an independent federal interest in discouraging public participation in commercial lotteries, including casino gambling, and thereby minimiziiig the wide variety of social ills that have historically been associated with these forms of gambling.” The district court rejected this interest outright, concluding that the government had presented no specific evidence to support its claim that modern day lotteries are the vehicles of social ills.
The district court was correct in its premise. The government’s burden “is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real...” Edenfield v. Fane, 507 U.S. 761, 770-71, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993); see also Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 648, 105 S.Ct. 2265, 2280, 85 L.Ed.2d 652 (1985) (rejecting State’s asserted interest in ban on illustrations in advertising by attorneys because “[t]he State’s arguments amount to little more than unsupported assertions; nowhere does the State cite any evidence or authority of any kind for its contention ... ”). This requirement does not, however, rise to the level of strict scrutiny; we have expressly held that “the asserted governmental interest must be ‘substan *-252 tial,’ rather than ‘compelling.’ ” Association of Nat’l Advertisers, Inc. v. Lungren, 44 F.3d 726, 729 (9th Cir.1994), cert. denied, — U.S. —, 116 S.Ct. 62, 133 L.Ed.2d 25 (1995) (applying the “ ‘more relaxed inquiry1 ” of intermediate scrutiny to restrictions on commercial speech).
Applying these principles, we are persuaded that the harms sought to be avoided are real. The government included in its pretrial papers excerpts from a 1984 hearing before the President’s Commission on Organized Crime. These excerpts address, in part, “the attraction of traditional organized crime groups to licensed casinos.” Organized Crime and Gambling: Hearings Before the President’s Commission on Organized Crime, at vii (June 1985). Although it is true that the scope of the government’s submissions is not extensive, and although portions of the proffered hearings suggest that “the threat of organized crime control has diminished considerably,” id. at 22, the report when read in its entirety indicates that a link exists between casino gambling and organized crime. See id. at 617 (noting connection between casino employees and organized crime); id. at 622 (noting “substantial organized crime involvement” in the junket industry); id. at 801-03 (discussing methods employed by organized crime to “skim” money from casino gambling operations); id. at 805-12 (“Increasingly, organized crime has used casinos like private banks to launder the proceeds of narcotics trafficking.”); id. at 515-17 (testimony of member of organized crime family regarding Chicago crime family’s control of Las Vegas casinos); id. at 528-31 (discussing money laundering schemes employed in private casinos).
Further supporting the government’s interest is the fact that the Supreme Court, in Posadas de Puerto Rico Associates v. Tourism Co., 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), recognized as substantial an interest very similar to that asserted by the government here. The Posadas Court rejected a First Amendment challenge to legislation enacted by Puerto Rico which prohibited the advertisement of casino gambling aimed at residents of. the Commonwealth. Puerto Rico asserted as its interest a desire to reduce the demand for casino gambling among its residents; specifically, the legislature was concerned that “[ejxeessive casino gambling among local residents ... would produce serious harmful effects on the health, safety, and welfare of the Puerto Rican citizens, such as the disruption of moral and cultural patterns, the increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime.” Id. at 341, 106 S.Ct. at 2977 (quotation omitted). The Supreme Court had “no difficulty in concluding that the Puerto Rico Legislature’s interest in the health, safety, and welfare of its citizens constitutes a ‘substantial’ government interest.” Id.; see also United States v. Edge Broadcasting Co., 509 U.S. 418, 425-27, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993) (recognizing gambling as a “vice”); cf. Renton v. Playtime Theatres, Inc., 475 U.S. 41, 54, 106 S.Ct. 925, 932, 89 L.Ed.2d 29 (city has substantial interest in “preserving the quality of life in the community at large”), cert. denied, 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986). We similarly conclude that the government’s interest in discouraging the public from participating in commercial lotteries is sufficiently substantial to meet the requirements of Central Hudson.
We note that the government, throughout this litigation, has defined its interest broadly ás reducing public participation in commercial lotteries. The evidence it has submitted to us pertains primarily to the pernicious effects of casino gambling. We will not take it upon ourselves to narrow the government’s asserted interest sua sponte, however. Indeed, in light of the historical tradition of the regulation of commercial lotteries, we are persuaded that discouraging participation in such games of chance overall is a substantial interest.
We turn to the government’s second asserted interest — “to assist states that prohibit casino gambling ... by regulating interstate activities such as broadcasting that are beyond the powers of the individual states to regulate.” The district court, casting this interest as accommodating the lottery policies of all states, recognized it as substantial. The government now asserts that the district *-251 court mischaracterized its interest. As the government explains, its interest is not in. protecting state choice, but in protecting those states that choose not to permit casino gambling.[4]
The interest in protecting non-casino states was indirectly recognized in Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903).' In ruling that Congress had the authority to prohibit the interstate transport of lottery tickets, the Court stated:
In legislating upon the subject of the traffic in lottery tickets, as carried on through interstate commerce, Congress only supplemented the action of those States — perhaps all of them — which, for the protection of the public morals, prohibit the drawing of lotteries ... within their respective limits. It said, in effect, that it would not permit the declared policy of the States, which sought to protect their people against the mischiefs of the lottery business, to be overthrown or disregarded by an agency of interstate commerce.
Id. at 357, 23 S.Ct. at 327. Although Champion is not directly on point, we read it to suggest that the government may indeed legitimately favor the interests of non-casino states.[5]
We cannot ignore the fact that broadcást signals cannot be contained within state borders and individual states cannot control interstate broadcasts. Thus, as demonstrated here, advertisements that are broadcast from states which permit casino gambling will be viewed by residents in states which prohibit such conduct. Without the assistance of the federal government, non-casino states will have no effective means to protect their residents from such spillover; their antigambling policies would thus be compromised.
In reaching the conclusion that this second interest is indeed substantial, we reject the Broadcasters’ assertion that our holding conflicts with United States v. Edge Broadcasting Co., 509 U.S. 418, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). In Edge Broadcasting, the Court upheld against First Amendment challenge federal statutes which prohibited the broadcast of lottery advertising by those broadcasters licensed in states which did not allow lotteries, while allowing such broadcasting by broadcasters in states where lotteries were permitted. In reaching its conclusion, the Court recognized as substantial the government’s purported interest in protecting state choice. See id. at 425-29, 113 S.Ct. at 2703-04. Nowhere in the opinion did the Court reason that the protection of non-lottery states at the expense of lottery states was unconstitutional, however. Indeed, there is language in Edge Broadcasting that suggests that the protection of non-lottery states may be a substantial interest. See id. at 426, 113 S.Ct. at 2703 (“[W]e are quite sure that the government has a substantial interest in supporting the policy of nonlottery States, as well as not interfering with the policy of States that permit lotteries.”).
B
Having found both of the government’s articulated interests to be substantial, we must next determine whether section 1304 directly advances these interests. Ulti *-250 mately, what is required is “a fit between the restriction and the government interest that is not necessarily perfect, but reasonable.” Edge Broadcasting, 509 U.S. at 429, 113 5.Ct. at 2705. However, “the regulation may not be sustained if it provides only ineffective or remote support for the government’s purpose.” Edenfield, 507 U.S. at 769, 113 S.Ct. at 1800 (quotations omitted). Rather, the government must demonstrate that “its restrictions will in fact alleviate [the asserted harms] to a material degree.” Id.
We take special note of the recent decision in bb Liquormart, Inc. v. Rhode Island, — U.S.—, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), where the Supreme Court unanimously struck down two Rhode Island statutes which prohibited the advertising of alcoholic beverage retail prices anywhere other than at point of purchase.[6] While all nine justices concurred in the judgment, none of the rationales for doing so was able to garner a majority. Justice Stevens, joined by Justices Kennedy and Ginsburg, stated that in the context of the “drastic nature of the means chosen” to forward the state’s interest in promoting temperance — “the wholesale suppression of truthful, nonmisleading information,” — the Court must determine whether the “price advertising ban will significantly reduce alcohol consumption.” — U.S. at —, 116 S.Ct. at 1509 (emphasis in original). Justice Stevens firmly stated that Rhode Island could not rely upon mere, “speculation and conjecture” to advance its interests. Id. at—, 116 S.Ct. at 1510. While bb Liquor-mart fails to present a coherent framework for reviewing these claims, one point is clear: the government’s asserted interest in reducing demand for casino gambling seems less likely to succeed following the Court’s decision.
By eliminating a potent means of persuasion, section 1304 would appear to advance directly the government’s interest in discouraging public participation in commercial lotteries. It is true that, as the Broadcasters assert, the government has presented no studies demonstrating the link between public participation in gambling and the advertising thereof. See Edenfield, 507 U.S. at 769-73, 113 S.Ct. at 1800-01 (rejecting State’s claim that ban on personal solicitation by CPAs directly advanced State’s interest in insuring ethical nature of practice because State presented no evidence of such connection). However, common sense suggests that advertising increases participation; indeed, were this not so, it is unlikely that casinos would seek to advertise on the Broadcasters’ stations. Moreover, the Supreme Court has expressly recognized the connection between advertising and demand. See Posadas, 478 U.S. at 341 — 42, 106 S.Ct. at 2976-77 (concluding that ban on casino advertisements would serve to reduce public participation in casino gambling); see also Central Hudson, 447 U.S. at 557, 100 S.Ct. at 2346-47 (State’s interest in reducing demand for electricity directly advanced by ban on promotional advertising).
That said, we are troubled by the numerous exceptions to section 1304. Although criminalizing broadcast advertising by commercial lotteries, the regulatory scheme at issue here permits the following lotteries to advertise via the airwaves: state-run lotteries, fishing contests, not-for-profit lotteries, lotteries conducted as promotional activities by commercial organizations, and, perhaps most significantly, any gaming conducted by Indian Tribes pursuant to the Indian Gaming Regulatory Act. See 47 C.F.R. § 73.1211(e). The question we thus must resolve is whether the existence of these myriad exceptions precludes section 1304 from directly advancing the government’s purported interests.
We take guidance from the Supreme Court’s recent decision in Rubin v. Coors Brewing Co., — U.S.—, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). In Coors Brewing, the Court held 27 U.S.C. § 205(e)(2), which prohibited brewers from disclosing on labels the alcohol content of their beers, to be inconsistent with the First Amendment. The *-249 Court agreed with the government that the speech at issue concerned a lawful activity, and that the government’s asserted interest — avoiding “strength wars” — was substantial. The Court was not persuaded that section 205(e)(2) directly advanced the asserted interest, however. In reaching this conclusion, the Court emphasized the numerous exceptions to section 205(e)(2), specifically noting that the regulatory scheme permitted both the disclosure of alcohol content in advertising (although prohibiting it on labels) and the disclosure of alcohol content on the labels of distilled spirits (although prohibiting it on beers). Deeming such a regulatory scheme “irrational,” the Court explained that “[t]here is little chance that [the regulation at issue] can directly and materially advance its aim, while other provisions of the same act directly undermine and counteract its effect.” Id. at-, 115 S.Ct. at 1593.
The government has consistently characterized its primary interest as “discouraging public participation in commercial lotteries, including casino gambling, and thereby minimizing the wide variety of social ills that have historically been associated with these forms of gambling.” By the government’s own description, then, its interest is an extremely broad one — reducing public participation in all commercial lotteries. Taking the government’s claim at face value, the statutory scheme here would appear to be flawed in the same manner as section 205(e)(2) was in Coors Brewing. That is, because section 1304 permits the advertising of commercial lotteries by not-for-profit organizations, governmental organizations and Indian Tribes, it is impossible for it materially to discourage public participation in commercial lotteries. To use the language of Coors Brewing, “[t]here is little chance that [the challenged regulation] can directly and materially advance its aim, while other provisions of the same act directly undermine and counteract its effects.” Coors Brewing, — U.S. at—,115 S.Ct. at 1593.
In reaching our conclusion, we are not unmindful of the Supreme Court’s earlier decision in Posadas de Puerto Rico v. Tourism Co., 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). In Posadas, the Court squarely rejected the argument that, because the challenged regulation permitted horse races, cockfights, and the lottery to advertise, the regulation could not advance the government’s interest. The Court reasoned: “whether other kinds of gambling are advertised in Puerto Rico or not, the restrictions on advertising of casino gambling ‘directly advance’ the legislature’s interest in reducing demand for games of chance.” Id. at 342, 106 S.Ct. at 2977.
In reconciling our decision with Posadas, we note the substantial distinction between Posadas and the case that the government has presented here.[7] In Posadas, Puerto Rico defined its interest narrowly as “the reduction of demand for casino gambling by the residents of Puerto Rico.” Id. at 341, 106 S.Ct. at 2976. As the Court explained,
the legislature’s interest, as previously identified, is not necessarily to reduce demand for all games of chance, but to reduce demand for casino gambling.... In other words, the legislature felt that for Puerto Ricans the risks associated with casino gambling were significantly greater than those associated with the more traditional kinds of gambling in Puerto Rico.
Id. at 342-43, 106 S.Ct. at 2977 (emphasis added).
Here, however, the government has consistently articulated as its interest the desire to reduce public participation in all commercial lotteries. Permitting some commercial lotteries to advertise — as 47 C.F.R. § 73.1211(c) does — would without doubt undermine this broad interest. Nor will recasting the government’s interest to be merely the reduction *-248 of public participation in casino gambling aid the government. Here, unlike Posadas, the regulations contain an exception even for casino gambling — casinos operated by Indian Tribes pursuant to the terms of the Indian Gaming Regulatory Act are exempted from the provisions of section 1304.[8] See 47 C.F.R. § 73.1211(e)(3).
Having concluded that the government’s purported interest in reducing participation in commercial lotteries fads to satisfy Central Hudson, we are left to consider whether the government’s remaining interest meets this test. As noted, the government’s second asserted interest is “to assist states that prohibit casino gambling ... by regulating interstate activities such as broadcasting that are beyond the powers of the individual states to regulate.”
The government argues that broadcast signals are not contained within state borders and that states cannot regulate the interstate transmission of broadcasting; accordingly, there is likely to be some spillover of casino advertisements from states in which casino gambling is permitted into neighboring states in which it is not. By prohibiting the advertising of casino gambling in all states, the government avoids this spillover, effectively keeping broadcast advertisements out of those states which have determined that casino gambling is undesirable. This, the government suggests, directly advances its interest.
Again, however, we are concerned by the numerous exceptions to section 1304. In particular, our attention is drawn to 47 C.F.R. § 73.1211(e)(3), which excludes “[a]ny gaming conducted by an Indian Tribe pursuant to the Indian Gaming Regulatory Act” from the reach of section 1304. Such exemption permits Indian Tribes to advertise both in states which allow casino advertising and in those which forbid it. This would appear to undermine the government’s purported interest in protecting non-casino states from the reach of casino advertisements on the airwaves. It may be that such advertising is limited in scope, intruding little on non-casino states, and thus does not interfere with the government’s interest in protecting those states. Unfortunately, however, the government has failed to provide any evidence demonstrating this fact — in the process failing to demonstrate that “its restrictions will in fact alleviate [the asserted harms] to a material degree.” Edenfield, 507 U.S. at 771, 113 S.Ct. at 1800. Again, Coors Brewing and kk Liquormart counsel against holding that section 1304 satisfies the requirements of Central Hudson.[9]
III
Having concluded that section 1304 and the regulations thereunder fail to satisfy Central Hudson, we are compelled to strike them down as an unconstitutional infringement of the Broadcasters’ First Amendment rights.
AFFIRMED.

. 18 U.S.C. § 1304 provides, in relevant part, that:
Whoever broadcasts by means of any radio or television station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance ... shall be fined not more than $1,000 or imprisoned not more than one year, or both.
The language of 47 C.F.R. § 73.1211(a) is substantially identical. For this reason, the balance of this opinion will refer only to § 1304.

. Because the federal government is, at present, not prosecuting the Broadcasters under the challenged regulations, standing will exist only if the Broadcasters can demonstrate a "reasonable threat of prosecution for conduct allegedly protected by the Constitution.” Ohio Civil Rights Comm’n v. Dayton Christian Schools, Inc., 477 U.S. 619, 625 n. 1, 106 S.Ct. 2718, 2722 n. 1, 91 L.Ed.2d 512 (1986). The district court concluded that the Broadcasters had standing to adjudicate this case. We agree.
The Broadcasters have alleged the nature and content of the of the advertisements they wish to broadcast. The Federal Communications Commission, which actively enforces the challenged regulations, has historically found similar advertisements in violation of these provisions. Accordingly, the Broadcasters have demonstrated a “reasonable threat of prosecution” and thus have standing to assert their challenge.

. The Broadcasters claim in passing that § 1304 is a content-based regulation of speech. Thus, they contend, under the standard set forth in R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), § 1304 must be subject to strict scrutiny.
Although R.A.V. requires that the content-based regulation of proscribable classes of speech be subject to strict review, it is unclear whether .R.A.V.'s holding extends to commercial speech. Despite a suggestion in R.A.V. that strict scrutiny indeed does apply to the content-based regulation of commercial speech, see id. at 388-89, 112 S.Ct. at 2545-46 (suggesting that state regulation of price advertising would fall within parameters of R.A.V. in certain contexts), the Supreme Court has continued to apply Central Hudson in the commercial speech context in cases following R.A.V. See United States v. Edge Broadcasting Co., 509 U.S. 418, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993) (applying Central Hudson to First Amendment challenge to 18 U.S.C. § 1307). Several courts have, however, either applied or considered the potential application of R.A.V. to regulations restricting commercial speech. See MD II Entertainment Inc. v. City of Dallas, 28 F.3d 492, 495 (5th Cir.1994) (recognizing potential application of R.A.V. in commercial speech context); Homell Brewing Co. v. Brady, 819 F.Supp. 1227, 1232-33 (E.D.N.Y.1993) (applying both Central Hudson and R.A.V. without deciding which is required); Citizens United for Free Speech II v. long Beach Township Bd. of Comm’rs, 802 F.Supp. 1223, 1232 (D.N.J.1992) ("It is clear from the Supreme Court’s recent decision in R.A.V. v. St. Paul, that commercial speech must be protected by the usual strictures against content-based distinctions.”).
Although the applicability of R.A.V. in the commercial speech context poses a question of interest, we need not resolve it. Even were we to conclude that R.A.V. applied, we are persuaded that § 1304 would nonetheless fall outside its scope. As R.A.V. makes clear, a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular secondary effects of the speech, so that the regulation is justified without reference to the content of the ... speech.” Id. (quotation omitted). Here, the government justifies § 1304 by reference to the social ills uniquely attendant to casino gambling, and not by the content of the speech itself. See Citizens United, 802 F.Supp. at 1233 (recognizing secondary effects exception to R.A.V. in commercial speech context, but concluding that defendants had not presented sufficient evidence of such).

. This alleged mischaracterization is significant because the district court went on to rule that § 1304 did not directly advance the government’s interest. The government concedes that if the protection of state choice were indeed its interest, the regulations at issue would not satisfy Central Hudson; however, the government contends, when the proper interests are recognized, the fit between legislative means and ends becomes clear.

. The government seeks further to support its interest by citing to legislative history. However, the cited history, although containing discussions of the need to protect non-lottery states, does so in a context which expressly recognizes state choice as the underlying interest. See S.Rep.No. 98-537, 98th Cong., 2d Sess., at 11-12 (Statement of Sen. Hatch) ("The laws currently in effect recognize the right of the individual states to make those decisions concerning lotteries and gaming that best respond to the desires of the people.”); see also 1974 U.S.C.C.A.N. at 7011. Nonetheless, because the asserted interest need not be the original interest behind the legislation, the absence of support in the legislative history does not doom the government’s purported interest. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 71, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469 (1983) (noting that the “insufficiency of the original motivation does not diminish other interests that the restriction may now serve").

. The Supreme Court recently granted certiorari in Greater New Orleans Broadcasting Ass'n, Inc. v. United States, 69 F.3d 1296 (5th Cir.1995) and summarily remanded the case to the Fifth Circuit for further consideration in light of 44 Liquor-mart. In Greater New Orleans, the Fifth Circuit had upheld the constitutionality of the very statute at issue in this case, 18 U.S.C § 1304 as amended by § 1307.

. We note that following 44 Liquormart much of the Court's reasoning in Posudas-especially its unquestioning acceptance of the state's assertions that the casino advertising ban furthered the government’s interest in reducing the demand for gambling without being more extensive than necessary to serve that interest-is no longer as compelling. See 44 Liquormart, — U.S. at -, 116 S.Ct. at 1522 (O'Connor, J., concurring) ("The closer look that we have required since Posadas comports better with the purpose of the analysis set out in Central Hudson, by requiring the State to show that the speech restriction directly advances its interest and is narrowly tailored.")

. This exception is significant to the government's own attempt to distinguish Coors Brewing. The government argues that "the problem in Coors was that the commercial speech allowed by Congress was worse, in terms of the 'strength war' policy, than the speech prohibited by Congress." In contrast, the government suggests, the exceptions enacted to section 1304 are readily explained “either in terms of the less pervasive impact of the advertised activities (for example, local charitable gambling) or the countervailing social benefits (federally regulated Indian gambling)."
Even accepting as true the government’s purported distinction, we remain unpersuaded that the speech prohibited here is "worse" than that which is permitted. The government identifies casino gambling as the most pernicious and pervasive form of commercial lottery. What the government fails to recognize, however, is that it permits that speech which it claims to be most pernicious, by exempting Indian casinos from the reach of its regulations. Nor are we persuaded that "countervailing social benefits” are a relevant part of an analysis of direct advancement.

. Because we conclude that the challenged regulations do not directly advance the government’s interests, we need not reach the final prong of Central Hudson.