**PLAYERS INTERNATIONAL, INC.,** Players Lake Charles, LLC, Players Star Partnership, Southern Illinois Riverboat/Casino Cruises, Inc., National Association of Broadcasters, Texas Association of Broadcasters, New Jersey Broadcasters Association, Mississippi Association of Broadcasters, Louisiana Association of Broadcasters, Missouri Broadcasters Association, West Virginia Broadcasters Association, Massachusetts Broadcasters Association, Inc., New Hampshire Association of Broadcasters, Inc., Illinois Broadcasters Association, H & D Broadcasting Limited Partnership, Raritan Valley Broadcasting Co., Inc., Plaintiffs,

v.

**UNITED STATES of America and Federal Communications Commission, Defendants.**

No. CIV. A. 96–4911.

United States District Court, D. New Jersey.

Dec. 19, 1997.

Mark Soifer, Deborah Mason, Horn, Goldberg, Gorny, Plackter & Weiss, Atlantic City, NJ, W. Randolph Teslik, P.C., Tom W.

Davidson, P.C., Todd S. Babbitz, Phuong N. Pham, Akin, Gump, Strauss, Hauer & Feld, LLP, Washington, DC, for Plaintiffs.

Elizabeth J. Shapiro, United States Department of Justice, Washington, DC, Louis J. Bizzarri, Assistant United States Attorney, Office of United States Attorney, Camden, NJ, for Defendants.

### AMENDED OPINION

RODRIGUEZ, District Judge.

This matter is before the court on defendants' motion for summary judgment and plaintiffs' cross motion for summary judgment on Count I (alleging First Amendment violations) and Count II (alleging equal protection violations under the Fifth Amendment) of its complaint. Plaintiffs are a casino developer/operator and its wholly owned subsidiaries, a national association of broadcast licensees, nine state associations of broadcast licensees, and two licensees of broadcast radio stations who either seek to purchase radio and television advertisements for casino gambling or to sell such broadcast advertisements for casino gambling. They commenced this action against the United States and the Federal Communications Commission ("FCC") seeking to enjoin the government from enforcing 18 U.S.C. § 1304 and its corresponding FCC regulation 47 C.F.R. § 73 .121.[1] Plaintiffs assert they want to purchase or sell advertising time concerning gaming activities by casino enterprises which fail to qualify under any of the listed exemptions to 47 C.F.R. § 73.1211, and contend that as a result of the FCC enforcement of U .S.C. § 1304 its members have been "deprived of advertising revenues and are losing business to other nonbroadcast competitors that are able to advertise non-Indian casino gaming." (Plfs.' Br. at 8).[2] Plaintiffs further believe that the FCC's enforcement of § 1304 has "led to confusing and arbitrary set of unduly restrictive regu-

lations" avowed to control the social harm caused by casino gambling (Plfs.' Br. at 3), but which are contravened by the "broad" exceptions which authorize the promotion of particular casino gaming activities, (Plfs.' Br. at 17). Finally, plaintiffs assert that the recent Supreme Court decision in 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), mandates a ruling in support of their position.

Grounding their arguments in legal and social history with respect to public participation in casino gambling, defendants contend that § 1304 and its corresponding regulation are constitutionally sound, and that 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711, does not impact on the constitutionality of the laws and regulations at issue. Defendants conclude that a finding in favor of plaintiffs would offend § 1304 by upsetting the goals which aim to discourage public participation in casino gambling advanced through § 1304's corresponding regulation.

### I. LEGAL BACKGROUND

Title 18 U.S.C. § 1304 provides:

Whoever broadcasts by means of any radio or television station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined under this title or imprisoned not more than one year, or both.

Each day's broadcasting shall constitute a separate offense.

---

1. Because the language of 47 C.F.R. § 73.1211(a) is substantially identical to 18 U.S.C. § 1304, the bulk of this opinion will generally refer to § 1304.

2. Presently plaintiffs are not being subjected to prosecution, however, because they have demonstrated a "reasonable threat of prosecution for

conduct allegedly protected by the Constitution," they have standing to adjudicate this case. *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986); *see also Valley Broadcasting Co. v. United States*, 107 F.3d 1328 (9th Cir.1997).

The Federal Communications Commission ("FCC") is the federal agency authorized to enforce Title 18 U.S.C. § 1304. As such, it implemented regulation 47 C.F.R. § 73.121 which parallels 18 U.S.C. § 1304 thereby prohibiting broadcast advertising of any "lottery, gift enterprise, or similar scheme." The regulation states in pertinent part:

(a) No license of an AM, FM, or television broadcast station, except as in paragraph (c) of this section, shall broadcast any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise or scheme, whether said list contains any part or all of such prizes.

47 C.F.R. § 73.121. The exceptions to this regulation read as follow:

(c) The provisions of paragraphs (a) and (b) of this section shall not apply to an advertisement, list of prizes or other information concerning:

(1) A lottery conducted by a State acting under the authority of State law which is broadcast by a radio or television station licensed to a location in that State or any other State which conducts such a lottery. (18 U.S.C. 1307(a); 102 Stat. 3205).

(2) Fishing contests exempted under 18 U.S.Code 1305 (not conducted for profit, ie., all receipts fully consumed in defraying the actual costs of operation).

(3) Any gaming conducted by an Indian Tribe pursuant to the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.)

(4) A lottery, gift enterprise or similar scheme, other than one described in paragraph (c)(1) of this section that is authorized or not otherwise prohibited by the State in which it is conducted and which is:

(I) Conducted by a not-for-profit organization or à governmental organization (18 U.S.C. 13079a); 102 Stat. 3205); or

(ii) Conducted as a promotional activity by a commercial organization and is clearly occasional and ancillary to the primary business of that organization. (18 U.S.C. 1307(a); 102 Stat. 3205).

47 C.F.R. § 73.1211.

Plaintiffs argue that the exceptions, particularly the Indian exception, have a detrimental economic impact on non-Indian casinos, and lack of "substantive difference between such activities [promoted via the exceptions] and the gaming activities conducted by non-Indian, commercially operated casinos." (Plfs.' Br. at 17–18). In contrast, defendants argue that the benefits provided to the exempted groups are supported by legislative concerns for the groups' economy and self sufficiency. As for the Indian exception, defendants argue it "stems from the federal government's unique Constitutional and trust obligation toward the Indian tribes[,]" an obligation which is not applicable to the plaintiffs in this case. (Dfts.' Br. at 3).

## II. *STANDARD*

Fed.R.Civ.P. 56(c) provides:

[T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The entry of summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about it might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2554. The non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.; Maidenbaum v. Bally's Park Place, Inc.*, 870 F.Supp. 1254, 1258 (D.N.J. 1994), *aff'd* 67 F.3d 291 (3d Cir.1995). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

■ However, in deciding the motion, the court does not "weigh the evidence and determine the truth of the matter, but [instead] determine[s] whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. If the non-movant has provided evidence exceeding the "mere scintilla" threshold in demonstrating a genuine issue of material fact, the court cannot weigh the evidence and credit the movant's interpretation of the evidence. This is so even if the movant's evidence far outweighs the non-movant's evidence. Credibility determinations are the province of the fact finder. *Big Apple v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

### III.  *LAW AND ANALYSIS*

A. *Legislative Intent under 18 U.S.C. § 1304 and 47 C.F.R. § 73.1211 of the FCC Rules*

The government contends that § 1304, and its counterpart, § 73.1211 of the FCC's rules are constitutionally sound under both the First and Fifth Amendments. It rejects plaintiffs' allegation that neither § 1304 nor its legislative history express an intent to include casino gaming within the scope of its advertising prohibitions. The government states: "[S]ection 1304 is part of a body of federal restrictions on lotteries and related gambling schemes that has been maintained by Congress for well over 100 years ." (Dfts.' Br. at 4).

■ In *Federal Communications Com'n v. American Broadcasting Co.*, 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954), the Supreme Court found three essential elements of a "lottery, gift enterprise, or similar scheme": (1) the distribution of prizes; (2) according to chance; (3) for consideration. 347 U.S. at 289–91, 74 S.Ct. at 597. Here, plaintiff seeks to advertise non-Indian casino enterprises which provide games involving money betting as consideration for a chance to win a prize. Such games satisfy the three essential elements established under *Federal Communications Com'n*, and consequently, fall within the scope of § 1304 and the FCC's rules.

B. *The First Amendment*

In order to determine whether the statutory prohibitions on the broadcast advertising of casino gambling pursuant to § 1304 and the FCC's rules violate the First Amendment, the parties rely upon the Supreme Court's four-part inquiry enunciated in *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). In *Central Hudson*, the Supreme Court held that a regulation of commercial speech is constitutional if the government shows:

(1) the regulated speech accurately informs the public about the lawful activity, (2) the governmental interest behind the regulation is substantial, (3) the regulation directly advances the interest asserted, and (4) the regulation is no more extensive than necessary.

*Id.* As to the first prong of the *Central Hudson* test the government does not dispute that plaintiffs "intend to broadcast truthful advertising about lawful gambling activities." (Dfts.' Br. at 14). Therefore, the

analysis begins with *Central Hudson*'s second step- whether the governmental interest behind the regulation is substantial.

### 1. *Substantial Interest*

The government's argument in support of *Central Hudson*'s second step is twofold. First, the government asserts that its interest in support of state anti-gambling policies became evident almost a century ago in *Champion v. Ames,* 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903). Accordingly, it argues that § 1304 and its corresponding regulations were implemented to help states "by disabling casino gambling and other forms of 'lottery, gift enterprise, or similar scheme' from reaching audiences in non-gambling states through broadcast advertising." (Dfts.' Br. at 15). Legislative history is provided by the government demonstrating Congress' rejection of attempts to legalize broadcasting of casino gambling ads. (*See, eg.,* Defense Exhibits A & D). In addition, the government notes "behind Section 1304 is an independent interest in reducing participation in casino gambling and other forms of private commercial gambling, and thereby minimizing the social costs associated with those activities." (Dfts.' Br. at ·17). Congressional findings and case law are offered in support of the propositions that gambling "contributes to corruption and the growth of organized crime" and "imposes a regressive tax on the poor…" (Dfts.' Br. at 18, n. 9 & 10). Although the government recognizes that it lacks "unfettered discretion to choose between advertising restrictions and equally (or more) effective non-speech related regulations[,]" *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711, it argues that generally the government has a substantial interest in reducing the social ills of casino gambling, *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).

Plaintiffs recognize defendants' concerns over gambling, particularly compulsive gambling, however, they state "[s]uch concerns are not sufficient to warrant the federal regulation of gambling any more so than concerns about overeating would justify federal regulation of the purchase and sale of food."

(Plfs.' Br. at 15). They conclude that the government failed to demonstrate "any causal connection between casino gaming and the social ills which the federal government seeks to prevent." *Id.*

### (a)

The validity of the government's argument requires an examination of *Posadas,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266, upon which they rely. In *Posadas,* the Supreme Court analyzed Puerto Rico's Games of Chance Act of 1948 which

> [L]egalizes certain forms of casino gambling in licensed places in order to promote the development of tourism, but also provides that "[no] gambling room shall be permitted to advertise or otherwise offer their facilities to the public of Puerto Rico." Implementing regulations prohibit the advertising of gambling parlors to the public in Puerto Rico but permit restricted advertising through publicity media outside of Puerto Rico.

478 U.S. at 328, 106 S.Ct. at 2970. Upon review of Puerto Rico's history, the Supreme Court recognized the island's longstanding attitude against casino gambling, an activity which was prohibited for approximately the first half of this century. 478 U.S. at 343, n. 8, 106 S.Ct. at 2978, n. 8. The Puerto Rican government firmly believed that advertising restrictions were necessary to reduce casino gambling participation by the island's residents. This interest was challenged by their desire to promote the island's economy which relies significantly on the tourism industry. 478 U.S. at 344, 106 S.Ct. at 2978. The legislation was created to promote tourism through casino advertising while restricting the flow of truthful information to its residents with the view that such restrictions would aid in reducing the social ills believed to be caused through gambling. Although the Supreme Court found that the legislation equated to restrictions on commercial speech, it found the legislation to be "no more extensive than necessary to serve the government's interest." *Id.* Consequently, the decision in *Posadas* found the challenged statute valid under *Central Hudson.* It was constitutional for the Puerto Rican government to

restrict commercial speech in an effort to protect its residents from casino gambling.

The government here claims that the portion of *Posadas* which discusses the second prong of the *Central Hudson* test should be read to confirm a general policy that governmental interest in minimizing the social ills of gambling, especially casino gambling, is a "substantial one." *Posadas*, 478 U.S. at 328, 106 S.Ct. at 2968. Its argument is based on the Supreme Court's conclusion in *Posadas* that Puerto Rico had a substantial interest in reducing the demand in casino gambling by its residents. That conclusion, however, was formulated as a consequence of the Court's review of the particular facts of that case together with Puerto Rican statutes and regulations restricting advertising of casino gambling aimed at residents of Puerto Rico. Within ten years of that decision, the court in *44 Liquormart* rejected *Posadas'* view of state discretion to suppress truthful, non misleading information for paternalistic purposes, and found that in rendering its decision it "erroneously performed the First Amendment analysis." *44 Liquormart*, 517 U.S. at ——, 116 S.Ct. at 1511. The Court in *44 Liquormart* states:

> Given our longstanding hostility to commercial speech regulation of this type, Posadas clearly erred in concluding that it was "up to the legislature" to choose suppression over a less speech-restrictive policy. The Posadas majority's conclusion on that point cannot be reconciled with the unbroken line of prior cases striking down similarly broad regulations on truthful, nonmisleading advertising when non-speech-related alternatives were available... [I]nstead, in keeping with our prior holdings, we conclude that a state legislature does not have the broad discretion to suppress truthful nonmisleading infor-

mation for paternalistic purposes that the Posadas majority was willing to tolerate. *Id.* at 508–09, 116 S.Ct. at 1511.[3] The Court in *44 Liquormart* resisted Rhode Island's attempt to suppress truthful nonmisleading information for paternalistic purposes, and under First Amendment analysis questioned the right of any legislature, state or federal, to enact broad regulations on truthful, nonmisleading advertising when non-speech-related alternatives are available.

Nevertheless, *44 Liquormart* does not reject the Supreme Court's finding that Puerto Rico has a substantial interest in reducing the demand in casino gambling by residents. 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711. Arguably, on that basis the government's reliance on *Posadas*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266, when considered together with additional information, provides support for its position that government intervention in reducing casino gaming will help minimize the social ills of gaming. Here, for example, the government submitted research regarding the psychological and pathological effect gambling has on the public; state studies focusing on the impact of casino gaming on crime; congressional hearings on national gambling impact and policy; newspaper articles on gambling addictions; and, findings made by the President's Commission on Organized Crime and Gambling-all of which do support its position that the government has a substantial interest in protecting the public by reducing participation in casino gaming.

However, the fact that *44 Liquormart* focuses on regulations of advertisements for alcoholic beverages does not preclude its applicability to other cases dealing with commercial speech. *See, e.g., Greater New Orleans Broadcasting Assoc., et. al. v. United States*, 69 F.3d 1296 (5th Cir.1995), *vacated*, —— U.S. ——, 117 S.Ct. 39, 136 L.Ed.2d 3

---

**3.** In 1973 the Supreme Court found that commercial speech was entitled to First Amendment protection. *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). This holding, however, did not reverse its decision in *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), wherein the Court ruled that First Amendment protection was not afforded to commercial speech about unlawful activities.

Case law also dictates that a State may restrict commercial advertising which exert "undue influence" over consumers, *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), but regulations imposed by States completely banning all promotional advertising will trigger heightened First Amendment concerns, and therefore must be reviewed with "special care[,]." *44 Liquormart, Inc.*, 517 U.S. at 494, 116 S.Ct. at 1504.

(1996)(remanded in light of *44 Liquormart, Inc.*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711).[4] Consequently, where anti-casino advertising regulations in effect touch on First Amendment protections as a means for protecting its citizens from the social ills cultivated through casino gaming, the holding in *44 Liquormart* must be considered.

Plaintiffs point to the "broad exceptions" to the broadcast advertising prohibition of § 1304, and assert two arguments. First, plaintiffs contend "[T]hese exceptions contravene, rather than promote, any asserted federal interest in supporting the policies of states that prohibit casino gaming." (Plfs.' Br. at 17). Secondly, plaintiffs maintain that there exists "no evidence" supporting the view that non-Indian gaming activities "create greater social or economic harm than other gaming activities conducted by Native Americans, states, charities, or governmental organizations, which are not subject to the federal casino advertising ban." (Plfs.' Br. at 18). They conclude "[T]he various statutory and regulatory exceptions to the federal casino advertising ban also undermine the credibility and substantiality of any asserted general welfare interest in discouraging public participation in lotteries or casino gaming." (Plfs.' Br. at 17).

Plaintiffs' argument, concerning the exceptions, mirrors a portion of the holding set forth by the Ninth Circuit in *Valley Broadcasting Co.*, 820 F.Supp. 519, aff'd. 107 F.3d 1328 (9th Cir.1997). At the district court level the government argued that the interest in banning the advertising of casino gaming stemmed from its "desire to curtail the spread of organized crime and the social costs of legalized gambling." 820 F.Supp. at 525. In response the district court noted

[T]o the extent casino gaming can be viewed as an attraction to elements of or-

ganized crime defendants offer no evidence that such elements are any more pervasive in casino gaming than in other forms of gaming for which no advertising limitations are enforced by the FCC.

Similarly, the social costs associated with legalized gambling, while very real, are hardly limited to casino gambling. They are common to all forms of legalized gambling including state lotteries, Indian casinos, horse racing, and charitable gambling. *Id.*

Here, the government did not show how casino gaming occurring in anti-casino states pursuant to the exceptions is less likely to promote the social ills advanced by casino gaming regulated by the FCC. It is illogical to believe that non-FCC regulated gaming, including casino gaming, does not promote the same social ills caused by FCC regulated gaming. Congress, in creating the exceptions in § 1304 and its corresponding rules, did not suggest that Native Americans, charities, states or government organizations cause different social ills from those caused by regulated gaming.

(b)

The government advances federalism principles as its shield against the argument concerning the undermining effects created by the exceptions to § 1304, stating "Congress may legitimately employ the Commerce Clause to legislate against social ills, subject only to the requirement that the regulated activities affect interstate commerce[,]" (Dfts.' Br. at 20), and finds irrelevant that some states choose to encourage casino gambling, ie. New Jersey and Louisiana, while others choose to encourage other forms of gambling covered by § 1304. The government concludes "Congress's [sic] assessment of federal interests cannot be trumped by a

---

4. In *Greater New Orleans Broadcasting Assoc., et. al. v. United States*, 69 F.3d 1296 (5th Cir.1995), *vacated*, —— U.S. ——, 117 S.Ct. 39, 136 L.Ed.2d 3 (1996), a Broadcasters association sued the federal government and the FCC seeking declaratory and injunctive relief permitting them to broadcast advertisements for legal gambling in area casinos despite the federal restrictions set forth under 18 U.S.C.A. § 1304 and its corresponding regulations. The Court of Appeals found that the challenged statute constitutionally restricted commercial speech with respect to casino gambling advertising, and held that the statute directly advanced the government's interest in discouraging gambling, notwithstanding the restrictions on commercial speech, and the numerous exceptions. However, the Supreme Court vacated the opinion and instructed the Court of Appeals to further consider the case under *44 Liquormart, Inc.*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711.

state's divergent assessment of its own interests[,] U.S. Const., Art. VI, and Congress is therefore not obligated to defer to the social and economic policies of individual states." (Dfts.' Br. at 21).

States have a substantial interest in regulating the health, safety, and welfare of its citizens. Since anti-casino states cannot prevent broadcast signals from crossing interstate lines, the interstate broadcasts of gaming activities has caused Congress, under U.S. Const., Art. III § 8, to attempt to regulate the broadcasting of "advertisements of or information concerning any lottery, gift enterprise, or similar scheme." 18 U.S.C. § 1304. The federalism interest attempts to protect the choice of those states, which reject the broadcasting of gaming activities within their boarders. *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). As such, the government does have an interest in exercising its commerce clause powers in a manner which protects a state's choice to prevent or promote the broadcasting of information regarding gambling. *See Valley Broadcasting Co.*, 107 F.3d 1328. Nevertheless, the holding in *44 Liquormart*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711, alerts the courts that a government's substantial interest in protecting its citizens from certain social ills does not preclude a finding that a regulation infringes upon well-established constitutional principles. Neither a state nor the federal government may surrender constitutional rights, such as those embraced by the First Amendment, as a means of restricting participation in certain activities on the premise that such regulations constitutionally prohibit the conduct or activity they seek to control. Indeed, under *44 Liquormart* the Supreme Court recognizes a government's ability to regulate activities regarded as a "vice" or as the cause of certain "social ills[,]" but it rejects those regulations imposing speech constraints, particularly where alternatives exist which satisfy the same needs and achieve the same end. *Id.*

> [W]e reject the assumption that words are necessarily less vital to freedom than actions, or that logic somehow proves that the power to prohibit an activity is necessarily "greater" than the power to suppress speech about it... [T]he text of the First Amendment makes clear that the Constitution presumes that attempts to regulate speech are more dangerous than attempts to regulate conduct... [T]he First Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another mean that the government may use to achieve its ends.

517 U.S. at 511–12, 116 S.Ct. at 1512.

Even where the evidence on record shows that a ban on advertising directly advances a government's substantial interest, the government must further demonstrate that the regulation it seeks to impose advances its interests to a "material degree[,]" and that the ban is no more extensive than necessary to serve the stated interest. *Id.* at 485, 116 S.Ct. at 1499. Where a court finds that other forms of regulations exist which direct social conduct without surrendering society's First Amendment freedoms, the government has failed to establish a "reasonable fit" between its regulation affecting speech and its goal. *Id.* Accordingly, this court must turn to the third and fourth prongs of *Central Hudson*, in order to determine whether the government has shown that § 1304's advertising ban serves to significantly reduce the social ills fostered through gaming activities.

2. *Does the Statute and Corresponding Regulation Advance the Interest Asserted or are Both More Extensive than Necessary to Serve that Interest?*

■ The final two factors under *Central Hudson* "[i]nvolve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Rubin v. Coors Brewing Company*, 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). A regulation "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson*, 447 U.S. at 564, 100 S.Ct. at 2350. Moreover, regulations which "indirectly advance" a state interest should also be struck. *Id.* Hence, a court must carefully consider whether the "general application" of the stat-

ute directly advances the government's interests. *Valley Broadcasting Co.*, 107 F.3d 1328. The government bears the burden of showing that the challenged regulation advances its interest "in a direct and material way." *Edenfield v. Fane*, 507 U.S. 761, 767, 113 S.Ct. 1792, 1799, 123 L.Ed.2d 543 (1993). "[M]ere speculation and conjecture" does not satisfy the government's burden. 507 U.S. at 771, 113 S.Ct. at 1800. The Edenfeld Court explains "[a] governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id*. In essence, the court must inquire whether the broadcasting restrictions implemented by § 1304 "will significantly reduce" public participation in gaming activities thereby enabling the government to advance its interest "to a material degree." *44 Liquormart*, 517 U.S. at 485, 116 S.Ct. at 1499.

Here, the government argues that "[b]oth as a practical matter and as a legal one" anticasino states such as Maryland, Pennsylvania and Florida, need government assistance in order to protect their citizens from commercial speech regarding casino activity transcending their borders. (Dfts.' Br. at 22). It maintains that decreasing casino advertising will reduce the demand for gambling, which in turn enables them to protect states' policies regarding gambling. (Dfts.' Br. at 24). The government rejects the view that § 1304 constitutes a "blanket prohibition" on casino gambling advertising since it applies only to the broadcast media. By finding that § 1304 does not equate to a "complete" ban, the government finds it unnecessary to follow the holding in *44 Liquormart*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711, which mandates consideration of the effectiveness of related alternatives.

According to the government § 1304 "goes no further than necessary" to protect states' policies against gambling and to discourage casino gambling participation. (Dfts.' Br. at 28–29). In effect § 1304 enables the government to insulate non-casino states from casino advertising without prohibiting advertising in those states permitting casino gambling. Thus, the government believes that § 1304 provides an effective means for handling problems associated with gambling, such as compulsive gambling, compared to other regulatory alternatives.

In contrast, plaintiffs assert that the government failed to meet its burden, that is, they failed to show the federal casino advertising ban "significantly advances the federal interest in favoring the policies of anti-gambling states or reduces the public demand for lawful casino gaming activities." (Plfs.' Br. at 19). Plaintiffs reject the government's attempts to distinguish the commercial speech analysis in *44 Liquormart*, from the issues here, and assert that

> [R]ather than restricting commercial speech, the federal government alternatively could choose to regulate casino gaming directly, impose a direct tax on participation in casino gaming, implement an educational program to discourage public participation in casino gaming, or provide anti-gambling states with additional funding to support their efforts to discourage casino gaming.

(Plfs.' Br. at 24). Citing to *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995),[5] as support, they contend that because the regulatory scheme at issue "is replete with numerous exceptions

---

**5.** The Court in *Rubin v. Coors Brewing Co.*, was faced with the challenge of determining the constitutionality of a regulation which prohibited beer labels from displaying alcohol content. 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532. Relying on *Posadas*, 478 U.S. 328, 341, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266, the government in *Rubin* justified the banning of truthful information claiming that the regulations protected citizens by preventing brewers from "competing on the basis of alcoholic strength, which could lead to greater alcoholism and its attendant social costs." 514 U.S. at 476, 115 S.Ct. at 1587.

Similar to this case, the government in *Rubin* attempted to persuade the Court that the regulations served to decrease social problems, and it urged the Court to "turn to history as a guide." 514 U.S. at 487, 115 S.Ct. at 1592. However, the Court concluded:

> The failure to prohibit the disclosure of alcohol content in advertising, which would seem to constitute a more influential weapon in any strength war than labels, makes no rational sense if the government's true aim is to suppress strength wars.

514 U.S. at 488, 115 S.Ct. at 1592.

and contradictory regulations" this court must find that it violates the First Amendment. (Plfs.' Br. at 19). Similarly, given the number of exceptions, "the Defendants cannot plausibly argue that the federal casino advertising ban effectively shields compulsive gamblers or anyone else from the 'atmosphere' of casino gaming." The defense "[i]mproperly assumes that a federal ban on commercial speech may be justified by a federal interest in assisting states in their efforts to suppress such speech." (Plfs.' Br. at 25).

The government suggests that restricting the ability to advertise gaming activities dissuades society from participating in such activities. It contends, therefore, that the restriction significantly advances its ability to both protect the interest of anti-casino states, and decrease the negative impact generated through gambling activities upon individuals, and consequently, society at large. Reason dictates that in today's society, television and radio advertising is perhaps the most lucrative means for promoting business activities. In addition, research supports the conclusion that gaming activity inevitably fosters social problems such as gambling addictions, and perhaps even violence. It, therefore, would seem reasonable to assume that the exceptions to § 1304 represent justified censorship of nonmisleading information which in turn satisfies the third prong of the *Central Hudson* test. However, upon closer review, the government's argument concerning its need to ban casino advertising to curtail the evils promoted through gambling activities is analogous to Rhode Island's view that censoring all advertisements that contain accurate and nonmisleading information about liquor sales advocates temperance and reduces consumption. Rhode Island sought to modify behavior through speech regulation. Section 1304 seeks to direct social behavior by banning

truthful information.[6] This court is informed by the reasoning and direction of *44 Liquormart*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711. As a result, the government in this case must be subjected to the same level of scrutiny, recognizing, of course, that the speech prohibitions it seeks to promote usually do not survive constitutional analysis.

> [B]ans that target truthful, nonmisleading commercial messages rarely protect consumers from such harms. Instead, such bans often serve only to obscure an "underlying governmental policy" that could be implemented without regulating speech.

*44 Liquormart*, 517 U.S. at 503, 116 S.Ct. at 1508 (quoting *Central Hudson*, 447 U.S. at 566, n. 9, 100 S.Ct. at 2351, n. 9).[7]

Here, notwithstanding the articles and studies submitted, the government provides no evidentiary support beyond a mere assumption, that § 1304's commercial ban on gaming advertising will significantly reduce gambling addiction or violence. Also, of equal concern is the manner in which the underlying governmental policy, banning nonmisleading commercial messages about gaming activities from the public, is subverted by the exceptions to § 1304. The exceptions allow the same activities the government believes cause significant public harm. Even though there is merit for allowing certain groups, such as the Native Americans, to increase their revenues by allowing them to promote casino activities, it does not follow that a blanket prohibition against truthful, nonmisleading speech about the same lawful activity by non-Indian casinos is the only means by which the government can reduce the feared social ills caused by public participation in gaming activities. Therefore, in light of the alternatives that are possible, it is appropriate to hold that § 1304's blanket ban on truthful and non-misleading advertisements of gaming activities fails constitutional

**6.** Rhode Island's regulation was struck because the state failed to present any evidentiary support that its speech prohibitions served to significantly reduce the market-wide consumption of alcohol. *44 Liquormart*, 517 U.S. at 504, 116 S.Ct. at 1509.

**7.** The Court continues
[P]recisely because bans against truthful, nonmisleading commercial speech rarely seek to

protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond "irrationally" to the truth.
*44 Liquormart*, 517 U.S. at 503, 116 S.Ct. at 1508 (quoting *Linmark Assoc. Inc. v. Willingboro*, 431 U.S. 85, 96, 97 S.Ct. 1614, 1620, 52 L.Ed.2d 155 (1977)).

muster. This conclusion does not suggest that the government lacks a legitimate interest in assisting states in confronting the social problems which may inevitably develop. It means that the government may not promote legislation which infringes upon the First Amendment, as a means of suppressing conduct it permits, rather than finding ways to restrict the conduct.

By allowing the government to promote § 1304's advertising ban of truthful information this court would be enabling the government to advance a regulation which is more extensive than necessary to serve the government's interest in protecting non-casino states from the broadcasting of casino advertisements. Close analysis of the evidence on record further dictates that the numerous exceptions permitted by the regulations defeat the government's ability to successfully maintain that the challenged regulation directly advances the government's interests in protecting society from the social problems promoted through gaming activities. As a result, the government has failed to show that the challenged regulation is in harmony with *44 Liquormart*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711, and consequently, has failed to satisfy the last two requirements of the *Central Hudson* test.

### IV. CONCLUSION

Accordingly, defendant's motion for summary judgment is denied, and plaintiff's cross-motion is granted. In addition, this court declares that the challenged statute and corresponding regulations are an unconstitutional infringement of plaintiffs' First Amendment rights.

An appropriate Order will be entered.

### AMENDED ORDER

For the reasons set forth in the court's opinion filed even date,

IT IS on this 19th day of December, 1997 ORDERED that defendant's motion for Summary Judgment is **DENIED;** and

IT IS FURTHER ORDERED that plaintiffs' cross-motion for Summary Judgment is **GRANTED;** and

IT IS FURTHER ORDERED that Title 18 U.S.C. Section 1304 and its companion regulation, 47 C.F.R. Section 73.12, unconstitutionally infringe upon plaintiffs' First Amendment rights.